UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERICA BETTS, et al.,

                Plaintiff,

                                         Case number 02-73435

v.                                          Honorable Julian Abele Cook, Jr.

COSTCO WHOLESALE CORPORATION,

                Defendant.

_____

ORDER

      The Plaintiffs, Erica Betts, Stephanie Lewis, Darrin Whitehead, Lavearn Thomas, Darrel Amour, and Nicola Barnes, are six African Americans were formerly employed by the Defendant, Costco Wholesale Corporation ("Costco") at its warehouse facility in Livonia, Michigan during all of the times that are relevant to this controversy.[1]  In their Complaint, they collectively allege that (1) the Company[2] and its former warehouse manager, Phillip Sullivan, subjected each of them to a hostile work environment and wrongfully terminated them on the basis of their race, and (2) Costco was negligent in its  hiring, training, and supervision of Sullivan.  All of these allegations have been denied by Costco and Phillip Sullivan.

      On March 23,2005, Costco filed  three separate motions, each of which seek the entry of a summary judgment against (1) Erica Betts, (2) Darrel Amour, and (3) Lavearn Thomas, Darrin

---

      [1]For the purpose of this order, the Costco facility in Livonia, Michigan is commonly known by the Company and its employees as "Warehouse 390."

      [2]The Defendant corporation will be identified in this Order interchangeably as "Costco" and "Company."

Whitehead, Stephanie Lewis, and Nicola Barnes.[3]

Having read the parties' briefs and listened to their oral arguments during a hearing on August 25, 2005, the Court grants Costco's motions for summary judgment in part, and denies them in part, for the reasons that are set forth below.

I.    Costco's Membership and Employment Practices and Policies

Costco operates more than 400 membership warehouses where it sells merchandise to the public at prices that are claimed to be generally lower than those found at other stores.  This Company is open only to its members who hold "Gold Star," "Business," or "Executive" membership cards.  Those persons, who possess "Gold Star" or "Business" cards, are required to pay an annual fee of $45 as a prerequisite to purchasing goods for their personal or business uses.  On the other hand, the "Executive" card members, who pay an annual fee of $100, are entitled to receive a 2% annual reward (up to $500) on most of their purchases.

In Section 2.4 of the Employee Handbook, which is delivered to every newly hired staff person, the Company sets forth the following anti-harassment policy:

> It is Costco's intent to provide a work and shopping environment free from all verbal, physical and visual forms of harassment for employees, members and vendors.  All employees are expected to be sensitive to and respectful of their co-workers and others with whom they come into contact while representing Costco. We prohibit all forms of harassment, whether due to race, color, national origin, ancestry, sex, sexual orientation, religion, age, disability, veteran status, political ideology, or any other reason.

(Betts Resp. Br. to Def.'s Mot. Summ J), (Ex. 5 at 12)

Under the terms of the Employee Handbook, employees are required to report evidence of any violation of this policy to a store manager or supervisor. It also establishes the grounds for the

---

[3]For the purposes of this Order, the Plaintiffs, Lavearn Thomas, Darrin Whitehead, Stephanie Lewis, and Nicola Barnes, will be identified as the "2% Plaintiffs."

2

imposition of disciplinary action and the termination of employment.[4]   For example, an employee, who is found to be in violation of Section 11.3 of the Employee Handbook (e.g., excessive tardiness or absenteeism, discourtesy, failure to perform work as required, and insolence), will receive a "counseling notice" of disciplinary action. (*Id.*, at 62-65).

## II.   Racial and Offensive Comments That Are Attributed to Phillip Sullivan et al

Costco opened a store in Livonia, Michigan (known in this Order as "Warehouse 390") in 1988.  On July 15, 2001, Phillip Sullivan was hired as its manager.  As the manager of this facility, he had the authority to hire, fire, and discipline employees.  (Def.'s Mot. Summ. J. as to 2% Pls., Ex. 44; Sullivan Decl. ¶ 5). Shortly after assuming his new job responsibilities, he made a series of comments that were thought to be offensive and racist by some of the employees, including the Plaintiffs.  Within his first few days as manager, Phillip Sullivan told one of the Plaintiffs, Darrel Amour, that working at Costco was "like working at a plantation because there's a lot of black people at the front [of the store, near the checkout counters]."  (Amour Dep. at 226.)  Two other Plaintiffs, Darrin Whitehead and Stephanie Lewis, both of whom worked as cashiers, overheard this remark and, in essence, verified the accuracy of Darrel Amour's recitation.  (Whitehead Dep. at 78; Lewis Dep. at 36.)  Reports of Phillip Sullivan's comment were widely disseminated among the employees throughout the store.  Darrel Amour also recalled that Phillip Sullivan, after making this "plantation" remark, began to place more white employees at the cash registers near the front end of the store.  (Amour Dep. at 244.)

At a later time, Darrel Amour, while standing with Terri McDaniel, an administrative warehouse manager, heard Phillip Sullivan tell other male staff members that he wanted to hire

---

[4]   Among the thirty grounds for termination in the Handbook include the following: "1. Falsification of Company records and/or time card[s]...." and "21. Extending or receiving unauthorized discounts, refunds, or credits; failure to record sales; ringing up own sales or a family member's sales; working with an open register."  (Betts Resp. Br., Ex. 5, at 60-62.)

"more white women with big breasts." ( Amour Dep. at 251-52.) Another Plaintiff, Nicola Barnes,

overheard two of these men, Darrin Schaefer and James Valdez, laughing about Phillip Sullivan's

comment in the Costco "break room."  (Barnes Dep. at 218.)

 A fifth Plaintiff, Stephanie Lewis, also heard Phillip Sullivan proclaim that "[he] would

prefer blondes with big breasts at the front register." ( Lewis Dep. at 17.)   She was told by him on

another occasion that the sixth Plaintiff, Erica Betts, was "a black widow spider that's going to

hang herself in her own web" and he "wouldn't hire nobody that black and ugly if it were left up

to [him]." ( Lewis Dep. at 16.)  He denies having made any of these statements.  (Sullivan Dep. I

at 129.)

 According to Darrel Amour, he was called Phillip Sullivan's "houseboy" and "bitch." by

a staff level manager, Darrin Schaefer. (Amour Dep. at 69-70.)   Although Darrel Amour

complained to Terri McDaniel about these offensive remarks and was given an assurance by her

that she would talk to Darrin Schaefer, the commentary continued without abatement. ( Amour

Dep. at 71-72.)

III. <u>The Discharge of the 2% Plaintiffs</u>

 Lavearn Thomas, Darrin Whitehead, Stephanie Lewis and Nicola Barnes were discharged

by Costco on February 1, 2002 for their alleged participation in an effort to obtain 2% rebate

awards in violation of the Company's policies..

 A. <u>Membership and the 2% Rebate</u>

 One of the benefits of employment at Costco is card membership. According to the

Company Handbook,  membership cards are non-transferable and are restricted to those persons

to whom the cards are issued.  (Def.'s Mot. Summ. J. as to 2% Pls., Ex. 6.)  However, Company

policy prohibited its employees, all of whom received training about the general nature of the

membership card program, from using their cards or other employees' cards. ( Lewis Dep. at 29;

4

Wade Dep. at 58-59).  Although the Costco membership card is not transferable, it was a common practice for the employees and supervisors of the Company to exchange them prior to 2001. Notwithstanding, a number of employees and supervisors testified during their depositions that they had observed other staff personnel using each other person's cards or giving their membership cards to another employee.  For example, Debra Blake testified that she had allowed other people to use her card and, in fact, had used other employee's cards.  (Blake Dep. at 2-3.)  Barbara Wade acknowledged that it was a common practice among the employees to run counter to the Company policy by using a fellow employee's  cards.  (Wade Dep. at 11.)  Michael Talbert, a front end supervisor, testified in his deposition that there were instances wherein he had given his membership card to other people for their use.  (Talbert Dep. at 63-66.) One of the Plaintiffs, Darrin Whitehead, stated that he knew of fellow employees who had (1) loaned their cards to members who had forgotten their cards or (2) left the membership cards in their cars.  ( Whitehead Dep. at 121-22.)

Following the discharge  of the 2% Plaintiffs on February 1, 2002, a memorandum was circulated throughout Warehouse 390 which reminded the staff that it was a violation of the Company policy for an employee to use another employee's membership card.  (Talbert Dep. at 69).  As a result, Debra Blake indicated that this unauthorized activity by staff no longer takes place at Warehouse 390.  (Blake Dep. at 3.)

B.    The Investigation of the 2% Plaintiffs

An internal investigation was initiated by Costco in January 2002 when an employee, Narquita Steanhouse, informed Paul DiLeo, a loss prevention agent, that Darrin Whitehead had sought to use Nicola Barnes' card to assist a customer who did not have her membership card.[5]

---

[5]According to Costco, a loss prevention agent reviews the records of the Company in an effort to determine if an employee has broken the law or violated Company policy.. *See* Def.'s

However, when the investigators (Paul DiLeo and Terri McDaniel) learned that other employees were also involved in similar conduct, they expanded their investigation to include all of the employees at Warehouse 390.

Their investigation was designed to be conducted in three steps. In the course of their first step, Paul DiLeo and Terri McDaniel examined every employee's "Member Shopping Inquiry."[6] If this inquiry revealed that an employee had (1) made a sizeable number of individual purchases or (2) spent a substantial amount of money during the 2001 fiscal year and the first four months of the following fiscal year, they agreed to expand their inquiry into the activities of the identified employee. Of the 160 staff persons whose shopping histories were examined, Paul DiLeo and Terri McDaniel narrowed their scope of inquiry to approximately twenty employees who, in their collective judgment, had unusual shopping histories or purchase patterns. They made this initial determination on the basis of their personal knowledge of the employee's personal background. For example, if Terri McDaniel or Paul DiLeo knew that a staff member had married during the 2001 fiscal year, they would excuse this employee (e.g., not subject him/her to any further investigation) even if his/her spending history was substantially greater than the preceding fiscal year. *See* Def.'s Br. Supp. Mot. Summ. J. on 2% Pl.'s, at 12.

Step Two of the investigation involved an examination by Terri McDaniel and Paul DiLeo into the membership activity reports of the designated employees, along with an identification of their purchases of "big ticket" items, as well as the acquisition of other unusual purchases and repetitive shopping in a single day. In Step Three, Paul DiLeo and Terri McDaniel printed the duplicate receipts for the dates of the questionable purchases, followed by an identification of the

Br. Supp. Mot. Summ. J. as to 2% Pl.'s, at 6-7.

[6]A "Member Shopping Inquiry" is a list of all purchases by an employee at Warehouse 390.

specific cashier who processed the transaction, an examination of the membership card that was used to effect the acquisition, and the method of payment used in each transaction.  This internal investigative procedure was followed by an interview with the employee who made the "questionable" purchases.

      C.      <u>The 2% Plaintiff (Lavearn Thomas)</u>

Lavearn Thomas was hired on March 17, 1998 as a front end assistant and later promoted to a full-time front end cashier position.  In October 2001, she was transferred to the Company's optical department and became a full-time service assistant. During their investigation of her purchasing history, Paul DiLeo and Terri McDaniel learned that she had made approximately 169 purchases during the 2001 fiscal year (totaling $5,402.00) and  48 purchases during the following four month period (representing  a total sum of $4,335.00).  After a further investigation, they collectively determined that she  had (1) made a number of repetitive purchases in one day; (2) allowed other Costco employees and non-members to use her membership card; (3) engaged in several transactions involving the same cashiers, including Nicola Barnes and Stephanie Lewis; (4) made purchases by using other persons' American Express credit cards; and (5) used her membership card for a transaction that was charged to someone else's card.  (Terri McDaniel Dec. Ex. C.[7])

Thereafter, Lavearn Thomas met with Sullivan, Terri McDaniel, and Gregory Brooks, an African American supervisor at another Costco store, and admitted that she had given her membership card to Nicola Barnes.  (Terri McDaniel Dep. at 59.)   At the conclusion of the interview, she submitted the following written statement to the interviewers:

---

[7]The 2% Plaintiffs point out that the Costco policy, which was in effect during the times that are relevant to this controversy, neither prohibited the repetitive use of a membership card for several same-day transactions nor shopping at the same cashier on a repetitive basis.

I LaVearn Thomas make the statement that I was aware of my membership card being use by Nicola Barnes. It was only suppose to by use for members who card was expired or didn't want to renewal or didn't have a membership card. I was not aware of people with credit card purchase using my card. It was supposed to be for cash only. Ms. Nicola Barnes did have my card for few days close to a week. I didn't get a good feeling about what we were doing and I ask for my card back. I also told her that she should stop too. It wasn't right. I did not report the matter to any one because I did not want to be label as a informer. I went to the individuals that I know was doing it and I verbally [asked] them to stop.

(Thomas Dep., Ex. 7.)

At her deposition, however, Lavearn Thomas reiterated her belief that she enjoyed the freedom to use other employees' cards without any meaningful limitations, noting that management had never prohibited the practice. (Thomas Dep. at 65-67.)

D.    The 2% Plaintiff (Darrin Whitehead)

Darrin Whitehead was hired on April 29, 1998 as a front end assistant. Like Lavearn Thomas, he was promoted to a front end cashier position. During the Christmas season of 2001, Phillip Sullivan selected him to assume a temporary supervisor position. The Paul DiLeo/Terri McDaniel investigation team discovered that he had 45 shopping activities during the 2001 fiscal year, which totaled $1,307.00. During the first four months of the 2002 fiscal year, he had 60 purchases which totaled $8,824.00. After learning that the number of Darrin Whitehead's purchased items had increased, Paul DiLeo and Terri McDaniel decided to continue their investigation of his activities at the store. Ultimately, they concluded that Darrin Whitehead, like Lavearn Thomas, had (1) made a large number of repetitive purchases in one day; (2) permitted other Costco employees and non-members to use his card; (3) made purchases at cash registers involving the same cashiers, including Nicola Barnes and Stephanie Lewis; (4) purchased merchandise by using other people's credit cards; and (5) made repetitive transactions in a relatively short time span.

Thereafter, Paul DiLeo and Barbara Wade conferred with him, a meeting that he later

8

characterized as a "lynching." (Whitehead Dep. at 132.) He denied having violated the Company policy and expressed his belief that his family and friends were entitled to use his membership card. Notwithstanding his protestations, Darrin Whitehead wrote and signed a statement, which read as follows:

> I Darrin Whitehead a big mistake by using my card and letting people use my card.
> I have been working four years and I wanted never but to do the right thing. I won't never do anything like this again. Please give me one last chance....
> I did know about the 2 percent and more than one cashier was doing the same thing and I four one never would do it again.

(Whitehead Dep., Ex 10.)

5.    The 2% Plaintiffs (Stephanie Lewis)

Costco hired Stephanie Lewis as a front end assistant in October 1999. During the following year, she was promoted to a part-time front end cashier position. In October 2001, she became a cashier on a full-time basis.

In the 2001 fiscal year, Stephanie Lewis made 150 purchases which totaled $4,4955.00. During the first four months of the next fiscal year, she made 44 purchases, totaling $1,545.00. After the initial investigation, which documented several instances in which she had used her membership card frequently within a relatively short period of time, Terri McDaniel scribbled a note which read: "Cannot confirm any wrongdoing. Suggest interview with employee." (2% Pl.'s Resp. Br., Ex. 25.)

During the interview, Stephanie Lewis denied that she had violated any Company policy and challenged Paul DiLeo and Terri McDaniel to provide her with proof of any wrongdoing. (Lewis Dep. at 110.) According to Stephanie Lewis, Terri McDaniel told her that she could not leave the meeting without submitting a written statement which would acknowledge her wrongdoing.. (Lewis Dep. at 111.) However, according to a written note that had been written by Terri McDaniel, Stephanie Lewis (1) advised her that Nicola Barnes, Darrin Whitehead, and

another African American employee, Evelyn Gray, had told her "they were using their [membership] cards to gain 2%," and (2) "admitted to knowingly ringing up transactions to assist other employees in earning 2% on executive memberships." (DiLeo Dep., Ex. 12.)

At the conclusion of the interview, she wrote the following statement:

> I hereby state that I the party of this first part of this (Costco) investigation did in (willing) or (unwillful) process participate in the action being taken against all & any fellow employees to allow the usage of executive memberships 2% card to possible members or non in accordance to purchases against Costco's by law standards to our rules (book) Knowing that this could cause repercussion toward my length of employment... I feel that I have stated my truth in not profiting from any of their executive transactions as stated and that a suspension is entitled to my probationary act of conduct due to such fact that I of sound reasoning would never intentionally steal or commit fraud against the company.

(Lewis Dep., Ex. 10.) Terri McDaniel later acknowledged that Stephanie Lewis was "more of a cashier participant than ... a membership card participant." (McDaniel Dep. at 38.) The counseling notice, which preceded her termination, read as follows:

> Extending or receiving unauthorized discounts. Stephanie has repeatedly been a cashier involved in questionable sales transactions involving several employees – although she has not gained anything personally, we believe she has knowledge of the possible conspiracy.

(Lewis Dep. I, Ex. 11.)

6..   The 2% Plaintiffs (Nicola Barnes)

Nicola Barnes was hired as a part-time front end assistant on October 19, 1999. Nearly two years later (September 2001), she was promoted to a full-time front end cashier position. She and Darrin Whitehead were the first employees to be investigated. An investigation into Nicola Barnes' shopping history revealed that she had (1) made 167 purchases during the 2001 fiscal year and spent $10,147, and (2) completed 74 purchases (representing the sum of $7,240) during the first four months of the 2002 fiscal year. Following their initial investigation, Paul DiLeo and Terri McDaniel determined that Nicola Barnes had engaged in several questionable practices, which

10

included (1) using her own membership card when ringing up other Costco members, (2) utilizing

other employees' membership cards when ringing up the purchases of other members, and (3)

allowing other cashiers to use her membership card to purchase "big ticket items."

During a follow up interview, Nicola Barnes acknowledged that she had used her

membership card to register the purchases by other Costco members and employees. However, she

insisted that there were other employees, including some supervisors, who were "letting other

people use their cards." (Barnes Dep. at 186.)  Nevertheless and at the conclusion of the interview,

she provided the investigators with the following written statement:

> During this interview I learned that extending or receiving my card or other
> employee card is unauthorized.  I am not in the conspiracy to defraud Costco or any
> member of Costco.  I am very sorry that my poor work ethics has resulted to this.
> I do not want my employment with Costco to be terminated.  During this interview
> I have learned that using my card repetitive in the same day can result in suspicious
> activity.  Failing to promote membership sales to friends and family members is not
> doing my part as an employee at Costco.   Endangering other employee's
> employment at Costco; is not what I intended to do.  I was told and have seen
> supervisors use their card the same way I have.  I did not think it was wrong until
> this interview.  Please believe me that I enjoy working here at Costco.  That I would
> never ever do anything to defraud Costco, or it's members.

(Barnes Dep., Ex. 12)

> G.   The Investigation Of Other Employees

One of the individuals, who was investigated by Terri McDaniel and Paul DiLeo,.was

Angela Brasch, a white cashier. According to the investigation, she made 35 purchases during the

2001fiscal year which totaled $2,497.00. During the following  first four month period, she made

45 purchases and spent a total of $3217.00.  (2% Pl.'s Resp. Br., Ex 19.) Even though Angela

Brasch made repetitive transactions of her own sales in violation of the Company policy, Terri

McDaniel chose not to interview her. (Terri McDaniel Dep. at 34, 78-79.)

Justin Urbanowicz, another white employee, had 23 purchases during the 2001 fiscal year

(constituting a total of $1,211.00), and made 54 purchases (representing an expenditure of

$3,216.00) during the first four months of the 2002 fiscal year. .  Like Brasch,  Urbanowicz was not investigated beyond Step One.  (DiLeo Dep. at 59.)  Similarly, Joann Gostias and Virginia Caron, two other white employees, showed marked increases in their shopping patterns but were not investigated.  (DiLeo Dep. at 59-63.)

The records also indicate that Terri McDaniel  had substantially increased the number of her purchases from the 2001 fiscal year to the first four months of the 2002 fiscal year.  (2% Resp. Br., Ex. 35.)  Paul DiLeo and Phillip Sullivan, who conducted the investigation of all of the managers, concluded that she had not committed any wrongdoing.  (McDaniel Dep. at 84.) Likewise, Barbara Wade, a front end manager,[8] who had used her card more than any of the 2% Plaintiffs, was not investigated by Paul DiLeo or Terri McDaniel.  (Webb Dep. at 29.)

However, an 18 year old  white employee, Will Schindorff, who had made a large number of purchases, was investigated and eventually terminated because of his (1) involvement in the 2% rebate activity and (2)  use of a membership card to purchase alcohol.  (Terri McDaniel Dep. 56, Terri McDaniel Decl. ¶ 19; Terri McDaniel Decl. Ex. J-K.)

H.     Results of the 2% Rebate Investigation

Of the approximately twenty individuals whose records were examined, six of the employees (Nicola Barnes, Lavearn Thomas, Stephanie Lewis, Darrin Whitehead, Will Schindorff, and Evelyn Gray were terminated for "fraud to obtain 2% rewards." (2% Pls., Ex. 1.). This investigative team also determined that the other African American employees (i.e., Sonia Sinclair, Karla Wilson, Gina Tyler, Major Clora, and Darrel Amour) would not be discharged from their jobs because they had provided the Company with (1) reasonable explanations for their membership card usage or (2) legitimate explanations or credible denials for any questionable transactions in

_____

[8]Phillip Sullivan and Barbara Wade, who were allegedly involved in a romantic relationship at the time, subsequently married.

which their card was involved.  (McDaniel Decl. ¶ 24.). .

I.    The Termination of Erica Betts

In April 1998, Costco hired Erica Betts as a part-time front end assistant.  Thereafter, she worked in a variety of positions before being promoted to serve as a front end cashier supervisor in July 2001.  Two days after Phillip Sullivan assumed his duties as manager in mid-July 2001, her designation as a supervisor was withdrawn by him and shortly thereafter, she was demoted to a full-time cashier.  The proffered reason for this demotion was that she had received three counseling notices relating to her improper conduct during his first week at the store.

According to Lavearn Thomas, Phillip Sullivan, shortly after arriving at Warehouse 390, yelled at Erica Betts in front of other employees, waived an involuntary termination paper at her, and told her to act "like a human being."  (Thomas Dep. at 161.)[9]  Erica Betts maintains that she was constantly and unfairly harassed by Phillip Sullivan about her dress code and the use of her time card.  (Betts Dep. at 105.)  In complaining about the racial inequality in the treatment of employees by Costco, Erica Betts points out that she was  unfairly criticized and disciplined by Phillip Sullivan and Barbara Wade about her dress code at a time when white employees were not given similar sanctions for wearing the same type of clothing.  (Betts Dep. at 74-75, 87-88, 342-44.)

During the course of her employment with Costco, she received other counseling notices, for offenses that ranged from violations of the Company's cash handling procedures to excessive absenteeism and rudeness to customers. On August 27, 2001, Thomas Neal, an assistant manager, forwarded a memorandum to Richard Webb, a regional vice-president, which ostensibly documented several incidents of misconduct involving Erica Betts.  (Betts' Resp. Br., Ex. 13.)  At

---

[9] However, none of those persons who purportedly overheard Phillip Sullivan's comments reported them to the Company's  Department of Human Resources or to the upper management as required by Costco's non-harassment policy.

the bottom of the memo was a handwritten note from Phillip Sullivan, which read, "Richard: FYI. Seems to be pressing for the final write-up!!  This could be it but there will be a better issue coming soon, or should I act on this!!??  Sully."  (Id.)

On January 26, 2002, Erica Betts received two additional notices relating to incidents that allegedly occurred on January 23, 2002. The first notice pertained to her failure to maintain the cash drawer as prescribed by Company policy. The second notice was issued to Erica Betts because of her insolence or rudeness to a Costco customer..  (Betts Dep., Ex 15-17.)  She denied these allegations. (Id.) When Erica Betts received her third notice,[10] Phillip Sullivan recommended that she be fired.  (Sullivan Dep. I at 180.)  Like the other 2% Plaintiffs, she was discharged from the Company on February 1, 2002.

J.      The Termination of Darrel Amour

Darrel Amour, after being hired by Costco on April 15, 1998 as a part time sales auditor, was subsequently promoted to a back up payroll clerk position.  In May 1999, he became a payroll administrator under Terri McDaniels's supervision and with Dawn Maas, a white employee, serving as a back up payroll clerk.  His job responsibilities included reviewing, correcting, updating and incorporating employees' timecard entries into Costco's automated payroll computer system.

Hourly employees were issued identification cards which they were required to swipe through a designated mechanical device every time they arrived at work, took breaks, and left for the day.  This automated payroll system recorded all of the swipes by the employees.  If any of the employees forgot to swipe their card or swiped their card without promptly reporting to work,

_____

[10]It is Erica Betts' position that all of  these notices were the result of racially discriminatory treatment by Phillip Sullivan.  (Betts Dep. at 108.)  She also pointed to other employees who had received a comparable number of notices but were not terminated by the Company.  As an example, Erica Betts cites Michelle Jones, a white employee, who was suspended, but not terminated, for a variety of violations including tardiness, excessive absenteeism, and disobeying direct orders.  (Betts Resp. Br., Ex. 24, at 33.)

Costco maintained a daily "Exception Log" with which to track errors regarding the recording of date and time. (Sullivan Dep. I. at 23; Darrel Amour Dep. at 124-25, 175.) If an employee made an error in swiping, he was permitted to document the error through the use of the "Exception Log." In turn, the payroll department would make an appropriate adjustment to the employee's computerized time record. However, before making any final changes to the computerized data, payroll employees, such as Darrel Amour, were required to search the entries in the "Exception Log" for accuracy and, thereafter, obtain the approval of a manager or a supervisor for any requested modification to the personnel records.

According to Darrel Amour, this "Exception Log" was rarely used by the Warehouse 390 staff. (Amour Dep at 128-29.) Instead, the unwritten practice was for an employee to notify him directly about the desired modification and he, in turn, would make the requested time change. (Id.) In conjunction with his job responsibilities, he was also authorized by his supervisors to do whatever was necessary to ensure that the payroll was balanced. (Darrel Amour Dep. at 200.)

At some point prior to his discharge in the early part of 2002, Darrel Amour was offered the position of a hard lines manager which, in Phillip Sullivan's view, would improve the minority presence in leadership positions at Warehouse 390. (Sullivan Dep. at 18-19; Darrel Amour Dep. at 238.) However, Darrel Amour declined the offer, believing that he did not have sufficient amount of experience to do an adequate job. (Darrel Amour Dep. at 238-240.)

Darrel Amour, who was initially questioned during an internal investigation about the abuse of employee membership cards, was later cleared of any participation in this questionable activity. However, when Terri McDaniel received some information at a later time which suggested that Darrel Amour had repeatedly made changes in the time entries for himself and other employees in violation of Company policy, an investigation into the activities of his office ensued. In some cases, there were indications that Darrel Amour had made changes by using Terri McDaniel's name

15

and password without her approval. (McDaniel Dep. at 48, Sullivan Dep. at 101-02.) During a meeting with Sullivan, Darrel Amour acknowledged that he had changed some time entries without obtaining the requisite approval from his supervisors. (Amour Dep. at 196-97, 199-202.) Following this meeting, he was initially suspended and subsequently terminated on February 1, 2002.

Dawn Mass, Darrel Amour's payroll assistant, was also questioned about her role in modifying the time entries. Despite Darrel Amour's contention about her direct participation in the activities under investigation, she denied having violated any Company policy. (Amour Dep. at 209; Sullivan Dep. I at 101-02.) As a result, Dawn Mass was neither investigated nor disciplined and took over Darrel Amour's job following his termination. (Sullivan Dep. at 128.)

IV.    Standards for Summary Judgment

In addressing matters relating to motions for summary judgment, the Supreme Court opined in 1986 that "[o]ne of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Federal Rule of Civil Procedure 56©. provides that a motion for summary judgment should be granted only if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Here, the burden is upon Costco, as the moving party, to demonstrate the absence of a genuine issue of a material fact in this legal proceeding. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing this pending dispositive motion, the Court must examine all pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Fed. R. Civ. P. 56©; see *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boyd v. Ford Motor Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). Thus, it is the responsibility of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Hence, Costco can prove that a genuine factual issue is lacking if it can (1) present a sufficiency of evidence which would make the issue "so one-sided that [it] must prevail as a matter of law," *id.* at 252, or (2) point to the failure of the Plaintiffs to present enough evidence that is "sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Upon such circumstances, these Plaintiffs must act affirmatively to avoid the entry of a summary judgment against them. Fed. R. Civ. P. 56(e). However, it should be noted that a mere scintilla of supporting evidence is insufficient to prevent the granting of a dispositive award to the movant . *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford Motor & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Indeed, "[i]f the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

V.      Claims for Racial Discrimination

In order to make a claim for racial discrimination, the Plaintiffs may rely upon (1) direct evidence of discrimination or (2) indirect or circumstantial evidence of discrimination by using the burden-shifting framework that was originally established in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973); *Sniecinski v. Blue Cross Blue Shield of Mich.,* 666 N.W.2d 186, 193 (Mich. 2003). Utilizing this framework, once a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant produces such evidence, the presumption is rebutted, and the burden returns to the plaintiff to show that the defendant's reasons were not the true reasons for the employment decision, but a mere pretext for its discriminatory actions. *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 792 (1973); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d

17

344, 350 (6th Cir.1998).

    A.    <u>Direct Evidence</u>

The Plaintiffs assert that Phillip Sullivan's statements represent direct evidence of racial discrimination.  Direct evidence is that which "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).  Racial slurs and derogatory remarks to an employee by a decisionmaker are examples of direct evidence of discriminatory conduct.  *Harrison v. Olde Financial Corp,* 572 N.W.2d 679, 683 (Mich. Ct. App. 1997).

To support their position on this issue, the Plaintiffs point to several derogatory statements by Phillip Sullivan which, in their collective judgment, represent direct evidence of racial discrimination.[11] As offensive, insulting and insensitive as these statements may have been, none of them constitute direct evidence of racial discrimination under existing law.  Even when he yelled at Erica Betts to "act like a human being," this comment is facially devoid of any racial component.  Moreover, some of the other statements which have been attributed to Phillip Sullivan do not constitute direct evidence because they require some inference that he intended these comments to be racial in nature.  Inasmuch as his "black widow spider" comment, as well as the other statements

---

[11]The Plaintiffs attribute the following comments to Sullivan: (1) reference to Erica Betts as a "black widow spider that is going to hang herself in her own web," (2) speaking about Erica Betts to another Costco employee, "I wouldn't hire nobody that black and ugly if it were left up to me," (3) telling Lavearn Thomas, in reference to Erica Betts, "something about that girl just really gets down into my skin," (4) saying to a fellow co-worker that he "wanted to hire more white women with big breasts," (5) directing Kenya Banks, an outside vendor, to hire "more white people," (6) urging Erica Betts to "act like a human being," (7) telling Darrin Whitehead that he was his (Phillip Sullivan's) "go-to guy" because the African American employees could understand his language," and (8) complaining to Darrel Amour that being at Warehouse 390 "felt like working on a plantation because there's so many black up front."  *See* Betts Resp. Br. at 16; 2% Pl.'s Resp. B+r. at 38.

by him, are subject to legitimate multiple interpretations, they do not qualify as direct evidence of a racial bias. *See, e.g., Lavearn Thomas v. Dade County Public Health Trust*, 177 F.Supp.2d 1283, 1289 (S.D.Fla. 2001) ("Evidence that is subject to multiple interpretations or that merely suggests discrimination does not constitute direct evidence").

Phillip Sullivan's other comments which make reference to race also require an inference that he had a discriminatory intent to terminate the Plaintiffs' employment. While his "black and ugly" comment may strongly suggest evidence of Phillip Sullivan's racial animus, it does not constitute direct evidence under the law. *See Sniecinski,* 666 N.W.2d at 193 (plaintiff must "present direct proof that the discriminatory animus was causally related to the adverse decision").

Significantly, Darrel Amour testified that he had not attributed any racial animus to this comment because of his initial belief that Phillip Sullivan wanted to diversify the workforce and move African Americans from cashier positions into leadership positions. (Darrel Amour Dep. at 225-26.) It was only after Phillip Sullivan began to criticize Erica Betts and other African American employees that Darrel Amour, upon reflection, revisited the statement and interpreted as it as being racist in form and content. (*Id.* at 244.) Darrel Amour's deposition testimony demonstrates that, inasmuch as this assertion is subject to multiple interpretations, it cannot qualify as direct evidence of discrimination.

Similarly, the comment that Phillip Sullivan wanted to hire "more white women with big breasts" or "more white people" in general requires the inference that his desire to hire more white people should be construed as a design to terminate the employment of some or all of the African American employees because of their race. As for the statement that Darrin Whitehead was Phillip Sullivan's "go-to guy,"[12] this statement is similarly devoid of any racial animus.

_____

[12]The 2% Plaintiffs misstate the record. The deposition transcript reflects that Darrin Whitehead never stated that Phillip Sullivan called him his "go-to guy" or that he made any

19

Finally, the statements which have been attributed to Darrin Schaefer cannot qualify as evidence of discrimination.  Under certain circumstances, the word, "houseboy," could have a racial connotation.  However, in this instance, his statement does not constitute direct evidence of discrimination because he was not a decisionmaker.  The Sixth Circuit declared two years ago that "[c]omments made by individuals not involved in the decisionmaking process do not constitute direct evidence of discrimination."  *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).

In sum, the Plaintiffs have failed to identify any statements by a decisionmaker that "did not require a factfinder to draw any inferences" in order to conclude that their terminations were racially motivated.  In essence, they have failed to present any direct evidence of racial discrimination. *Harrison v. Olde Financial Corp,* 572 N.W.2d 679, 683 (Mich. Ct. App. 1997).

B.    Indirect Evidence

In order to establish a prima facie case of discrimination under ELCRA, a plaintiff must prove the following four elements; namely, that "(1) she belonged to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) [the adverse employment action] occurred under circumstances giving rise to an inference of unlawful discrimination."  *Sniecinski,* 666 N.W.2d at 193 (internal citations omitted).  In evaluating the arguments, this Court notes that the "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

---

explicit reference to race or color:

> Q.  And Mr. Sullivan never told you that I need to use you as a guinea pig to get these other people in line; is that correct?
> A.  Well, he had told me that I was one of the guys that I can get these people to do what I want because they understand, you know, I guess they understand my language better.

Darrin Whitehead Dep. at 182.

There is no dispute among the parties that the Plaintiffs are members of a protected class who suffered an adverse employment action. On the other hand, there is a genuine dispute as to whether the Plaintiffs were qualified for their respective positions and if they have identified a similarly situated individual who received more favorable employment treatment because of unlawful racial considerations. An employee is qualified if she was performing her job at a level that met the employer's legitimate expectations. *Town v. Mich. Bell. Tel. Co.,* 568 N.W.2d 64, 69 (1997). "A court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered non-discriminatory reasons for discharge." *Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 585 (6th Cir. 2002).

In this case, Costco maintains that the Plaintiffs have not satisfied its legitimate performance expectations. In maintaining this position, the Company contends that (1) Erica Betts was not qualified because she had a history of documented performance problems, (2) Darrel Amour did not meet the requisite employment qualifications because he falsified the payroll records and (3) the 2% Plaintiffs, violated its known and clearly established rebate policies. These arguments runs counter to an admonition from the Sixth Circuit which opined that "[i]nstead of using the discharge justification to judge whether [the plaintiff] was qualified at the prima facie stage, the Court should only consider the employer's proffered reason in the later stages of the *McDonnell Douglas* analysis."). *Cicero,* 280 F.3d at 585, 587-88 *See also Miller v. Firstar Bank N.A.*, 111 Fed.Appx. 796, 800 (6th Cir. 2004) (unpublished) ("At the summary judgment stage, the question is only whether a reasonable jury could find, *on the basis of the evidence provided by the plaintiff,* that she was qualified for her position.") (emphasis original).

As to Erica Betts, Costco cites *Ang v. Proctor & Gamble Co.*, 932 F.2d 540 (6th Cir. 1991), *McDonald v. Union Camp Corp*., 898 F.2d 1155 (6th Cir. 1990), and *Lawrence v. Syms Corp.,* 969 F.Supp 1014 (E.D. Mich. 1997). However, inasmuch as *Cicero* follows *Ang* and *McDonald* in time,

21

it - not *Ang* or *McDonald* - is controlling in this case. As for Darrel Amour, Costco cites three cases for the proposition that a plaintiff who falsifies company records cannot be held to meet his employer's legitimate expectations: *Jacobs v. Univ. of Wis. Hosp. & Clinics Auth.*, 12 Fed. Appx. 386, 390 (7th Cir. 2001) (unpublished decision); *Fox v. Southwestern Bell Tel. Co.,* 839 F. Supp. 678, 680 (E.D. Mo. 1993); *Jones v. Pepsi-Cola General Bottlers, Inc.,* No. 88-0739, 1989 U.S. Dist. LEXIS 16220, at *15-16 (W.D. Mo. 1989). Neither *Jacobs*, *Fox* nor *Jones* qualify as precedent over this Court and, therefore, are not controlling.

For the sole purpose of this motion, the Court will accept Costco's evidence that (1) Erica Betts received counseling notices for her inappropriate behavior to show that she was not qualified, (2) Darrel Amour was terminated for falsification of payroll records, and (3) the evidence demonstrated that the 2% Plaintiffs were violating company procedures. But when applying the evidentiary standards that must be applied in these dispositive motions, the Court determines that the Plaintiffs were sufficiently qualified for their respective positions at Warehouse 390 during the times that are pertinent to this inquiry.

The Sixth Circuit has explained that "the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the *relevant* aspects" in order for the two to be similarly situated. *Ercegovich*, 154 F.3d at 352 (emphasis original) (internal quotation marks omitted). In justifying her argument, Erica Betts points to Michelle Jones, a white employee who was not discharged from her job. She says that in a memorandum to Richard Webb, Phillip Sullivan wrote that Michelle Jones had "too many counseling notices and/or disciplinary problems to list." (Betts Resp. Br., Ex. 20.) Her violations included a "failure to report on time, multiple absences, tardiness, and disobeying direct orders." (Betts Resp. Br., at 10, 21-22.) Michelle Jones was suspended - but never terminated - by Phillip Sullivan despite her violations of the Employee Handbook. (Phillip Sullivan Dep. II at 32.) Costco challenges the merit of this argument,

22

contending that Michelle Jones and Erica Betts had different performances problems, and, as such, they should not be considered by the Court to be similarly situated individuals.  *See* Def.'s Reply Br. at 6.

Costco's argument reads the requirements for this prong too narrowly.  The Sixth Circuit has counseled that courts

> should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather....the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects."

*Ercegovich*, 154 F.3d at 352 (emphasis added) (internal citation and quotation marks omitted).

It is clear that Erica Betts and Michelle Jones did not engage in identical conduct.  However, the record is also clear that they were cited for *similar* conduct.  Like Michelle Jones, Erica Betts received counseling notices for excessive absenteeism on September 11, 2001, as well as for excessive tardiness and taking an extended break on December 8, 2001. (Betts Dep., Exs. 12-14.) In comparing employment decisions regarding discipline, "precise equivalence in culpability between employees is not required. Rather, the plaintiff must simply show that the employees were engaged in misconduct of comparable seriousness." *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 659 (6th Cir. 1999) (internal citation and quotations marks omitted).  Here, a jury, if presented with the conflicting evidence involving these two individuals, could logically and reasonably find that Erica Betts and Michelle Jones had engaged in misconduct of "comparable seriousness."  *Id.*  It is also noteworthy that Costco did not terminate Erica Betts for fighting or being rude to customers.  Rather, her job termination was based on that which Costco deemed to be "[s]erious misconduct of any kind as defined by the Company."  (Betts Dep., Ex. 18.)  In the opinion of this Court, the similarities between these two women create at least a genuine issue of a material fact as to whether

*Sniecinski* has been satisfied by Erica Betts.

There is also a dispute between the parties as to whether the Plaintiffs have identified a similarly situated individual for Darrel Amour who was terminated for having falsified payroll records. In his defense, he points to Dawn Maas as a person who had equal access to the computer payroll system and repeatedly changed other individual employees' time cards as well as her own. *See* Amour Resp. Br., Exs. G-N. Despite these allegations of misconduct, Dawn Maas, who replaced Darrel Amour as a payroll administrator, was neither investigated, disciplined nor terminated Amour (Amour Resp. Br. at 10.)

Costco counters by arguing that Dawn Mass does not satisfy the standard of being a similarly situated individual because she (1) had a job that was different from Darrel Amour's employment responsibilities, and (2) denied having altered the time cards. These two arguments are irrelevant. Under *McDonnell-Douglas*, the "similarly-situated" requirement may be demonstrated by a showing that the plaintiff was treated less favorably than a similarly situated individual outside of his protected class *or* that he was replaced by a person outside of the protected class. *McDonnell Douglas,* 411 U.S. at 802; *see also Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 728 (6th Cir. 2004). Here, Darrel Amour has raised a genuine issue of a  material fact as to whether he was replaced by a white employee who, in his opinion, was a similarly situated employee. Accordingly, this Court finds that he has established the fourth element of his prima facie case.

And finally, this Court must examine whether the 2% Plaintiffs have identified similarly situated individuals who were treated differently by Costco because of their race. The 2% Plaintiffs complain that several white several employees (including Michael Talbert, Kathy Marek, Barbara Wade, and Debra Blake) were not terminated despite having been accused of similar employment misconduct for which they were terminated. Costco challenges this contention, maintaining that these white employees did not engage in the same level of misconduct as the 2% Plaintiffs. As

24

noted by Costco, the 2% Plaintiffs have admitted that they had shared membership cards for member, *non-employee* purchases, all in violation of the company policy   (McDaniel Decl. ¶ 25.) By contrast, Costco posits that these four white employees only admitted that they had shared their membership cards with other employees.  The Sixth Circuit has opined that in order for aggrieved parties  to establish that they are similarly situated to other identified employees, they must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992).[13]

Based on its review of the record, the Court finds that the 2% Plaintiffs have identified similarly situated individuals to satisfy their prima facie case.  Like the 2% Plaintiffs, there is evidence which suggests that these white employees violated company policy by sharing membership cards.  Despite the language within the Employee Handbook and the training that was given to employees, the record is replete with testimony that African American and white employees shared their cards in presumptive violation of Company policy.

The 2% Plaintiffs also present a second argument on this issue.  In their brief, and again during the oral argument, the 2% Plaintiffs allege that the rebate investigation was discriminatory

---

[13]Costco cites *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994), for the proposition that a supervisor – like Talbert, Marek, and Wade – cannot be similarly situated to an employee like the 2% Plaintiffs.  *Pierce*, a sexual harassment case, is inapposite to this case.  In *Pierce,* the Sixth Circuit took pains to distinguish between a supervisor or a manager and an employee because such a distinction bore directly on the issue of liability.  *Id.* at 803-04.  For acts of sexual harassment committed by other employees, the employer is liable (under a respondeat superior theory) only if the employer (or its agents or supervisors) knew or should have known of harassing conduct.  *Id.*  If a supervisor, by contrast, commits an act of sexual harassment, the employer is liable irrespective of whether the employer knew or should have known about it.  *Id.*  In other words, the distinction between managers/supervisors and employees was dispositive of the issue of liability.  Here, by contrast, there is no singular distinction between managers and employees, and all employees are subject to Costco's membership card policies.

in its application.   Although the investigation was facially focused on all staff personnel at Warehouse 390, only the 2% Plaintiffs, three other African-Americans and a white employee were investigated at Step Three.   The 2% Plaintiffs have pointed out - and the evidence when viewed most favorable to them during this stage of the proceedings support their view - that their white counterparts (Angela Brasch, Barbara Wade, Michael Talbert, Terri McDaniel, Justin Urbanowicz, Virginia Caron, and Joann Gostias) were not investigated despite having questionable purchase histories.

Based on its review of the record, the Court concludes that the 2% Plaintiffs have presented a sufficiency of evidence of similarly situated individuals who had allegedly violated Company policy regarding the use of their membership card but were neither investigated beyond Step One nor disciplined for their "suspicious purchase patterns."   In making this determination, the Court is guided by (1) the declaration by the Supreme Court in *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981), that the "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," and (2) its duty at summary judgment to view the facts in the light most favorable to the Plaintiffs.   Thus, the Court finds that all of the Plaintiffs have established a prima facie case of race discrimination.

Since the Plaintiffs have established a prima facie case for racial discrimination, the burden then shifts to Costco to set forth a legitimate, nondiscriminatory reason for the termination of their employment.   *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir. 2003).   This burden is "one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).

Costco has satisfied its burden with regard to each Plaintiff, in that it has proffered a legitimate, nondiscriminatory reason for Erica Betts' discharge.   Costco points to the number of

26

counseling notices that were issued to her for offensive conduct which included insolence and discourtesy to its members, violations of cash handling procedures, excessive absenteeism and tardiness, and dress code violations. A series of well-documented performance issues and customer complaints is sufficient evidence to establish an employer's legitimate nondiscriminatory reason for a termination. *See, e.g., Cicero,* 280 F.3d at 588; *see also Hussain v. Highgate Hotels, Inc.*, 126 Fed.Appx. 256, 265 (6th Cir. Mar. 18, 2005) (unpublished) ("Poor performance is a legitimate non-discriminatory reason for termination.").

In presenting a legitimate, nondiscriminatory reason for Darrel Amour's discharge, Costco has proffered a sufficient amount of evidence which indicates that he falsified payroll records in violation of Company policy. Falsification of an employer's records is a legitimate, nondiscriminatory reason for an employee's termination. *See, e.g., Espitia v. Procter & Gamble Co.,* 93 Fed.Appx. 707, 710 (6th Cir. Mar. 1, 2004) (unpublished); *Redman v. Ohio Dept. of Highway Safety*, 1999 WL 1206893, *2 (6th Cir. Dec. 9, 1999) (unpublished).

Finally, Costco has presented ample evidence which suggests that the 2% Plaintiffs participated in a scheme to use their membership cards or other employees' cards to obtain a rebate on purchases by both employee members and non-employee members. According to the Employee Handbook, such an offense - if true - would establish sufficient grounds for termination. (Betts Resp. Br., Ex. 5, at 60-61) Given the evidence in the record, this Court concludes that Costco has presented evidence of a legitimate nondiscriminatory reason for the termination of the 2% Plaintiffs.

Now that Costco has proffered a legitimate, nondiscriminatory reason for the termination of each plaintiff from its employment, it is incumbent upon the Plaintiffs to show that the proffered reason is pretextual. This burden can be satisfied by demonstrating that the proffered reason (1) has no basis in fact, (2) did not actually motivate Costco's challenged conduct, or (3) was insufficient

27

to warrant the challenged conduct.  *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000).

Regardless of which option is used by the Plaintiffs, they retain the "ultimate burden of producing

sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and

infer that the [defendant] intentionally discriminated against [them]."  *Johnson v. Kroger*, 319 F.3d

858, 866 (6th Cir. 2003).

In the context of a summary judgment motion, the Michigan Supreme Court has counseled

that "disproof of an employer's articulated reason for an adverse employment decision defeats

summary [judgment] only if such disproof also raises a triable issue that discriminatory animus was

a motivating factor underlying the employer's adverse action."  *Lytle v. Malady*, 579 N.W.2d 906,

916 (Mich. 1998).

In her response to Costco's request for summary judgment relief, Erica Betts points to three

pieces of evidence that show pretext: (1) Phillip Sullivan's alleged racial comments and conduct;

(2) the disparate treatment in the application of disciplinary treatment of its white and African

American employees, and (3) the failure of the Company to expunge some of the counseling notices

from her employment file at the time of her termination.

In evaluating whether comments are relevant for establishing pretext, this Court must look

to several factors, including (1) the identity of the speaker,  (2) the "nexus" or "temporal connection"

between the discriminatory remarks and the challenged action, (3) the purpose and content of the

statement, and (4) whether the statement buttresses other evidence of pretext. *See Ercegovich,* 154

F.3d at 355-57.  At the same time, the Sixth Circuit has opined that "isolated and ambiguous

comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of []

discrimination."  *Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003) (quoting *Ercegovich*,

154 F.3d at 355).

Erica Betts points to the several racially offensive statements by Phillip Sullivan, to which

reference has been made earlier in this Order. Although Costco argues that his comments are devoid of any racial inference, this Court must view the facts in a light that is most favorable to the Plaintiffs for the purpose of evaluating this dispositive motion. On the basis of this standard, the Court concludes that these statements could arguably give rise to an inference of an unlawful racial animus which adversely affected their employment status with the Company.

In evaluating the next two factors, the Court notes that all of the alleged controversial statements were made over the course of a seven month period  – between mid-July 2001 and February 1, 2002.   Thus, the Court concludes that these statements, which were made in a sufficiently close time period, give rise to an inference of unlawful racial discrimination.

Finally, these allegedly derogatory comments are buttressed by Phillip Sullivan's conduct toward Erica Betts. In her deposition, Erica Betts complained that she was repeatedly harassed by Phillip Sullivan during the work day.  (Betts Dep. at 87, 203   She also complained that he, in addition to instructing some of the Costco supervisors not to schedule her for inventory duty, unfairly targeted her for dress code violations. (Betts Dep. at 74-75, 82).  These complaints of disparate treatment were supported and ostensibly witnessed by other employees.  *See, e.g.,* Amour Dep. at 244. This evidence, when viewed in a light that is most favorable to Erica Betts,  also indicates that Costco, through the conduct of its Warehouse 390 manager, acted with a form of discriminatory animus through his application of a disciplinary standard that made a distinction among its employees on the basis of their race.[14]

_____

[14]Costco submits that Erica Betts and Michelle Jones were treated equally, noting that Phillip Sullivan had recommended the termination of both employees.  (Sullivan Dep. II at 32.)  Although the 2% Plaintiffs focus on Phillip Sullivan's statements and conduct, their lawsuit alleges that Costco engaged in racially discriminatory conduct.  Consequently, evidence that these two female employees were treated differently by Costco management is relevant to establish evidence of pretext.

Erica Betts' arguments regarding pretext are augmented by the improper inclusion of counseling notices in her employment at the time of her termination. Section 11.3 of the Employee Handbook identifies "Causes for Disciplinary Action," and "Causes for Termination." While counseling notices relating to terminable offenses remain in an employee's personnel file indefinitely, the Company requires that notices which pertain to (1) "minor offenses" are to be removed from an employee's file after the expiration of a six month period, and (2)"absenteeism" are to be removed after one year. (Betts Resp. Br., Ex. 5, at 63.) Believing that accusations of discourtesy, insolence, and rudeness to a member constitute "minor offenses," Erica Betts submits that the three notices from Phillip Sullivan during his first week at Warehouse 390 should have been removed from her personnel file. (Betts Resp. Br. at 10.)

Costco counters that Erica Betts was not discharged for an accumulation of counseling notices,. Rather, the Company submits that she was terminated because of "serious misconduct of any kind as defined by the Company."[15] (Betts Dep. Ex. 18). [16] While this Court will not speculate as to whether Erica Betts would have been terminated as the result of the other counseling notices, it finds that she has presented sufficient evidence of a pretext to rebut the proffered reason for her termination.

Like Erica Betts, Darrel Amour focuses on the Phillip Sullivan's statements that he views as being evidence of racially discriminatory conduct by his employer. At this stage of the litigation, this Court must draw all inferences in favor of Darrel Amour. *See, e.g., Wexler v. White's Furniture, Inc.,* 317 F.3d 564, 578 (6th Cir.2003) (en banc) ("The conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary

---

[15]The record does not identify the "serious misconduct," to which Costco refers.

[16] Costco does not dispute that some of Erica Betts' counseling notices were improperly included in her personnel file when she was terminated

judgment in the case before us."). Thus, Phillip Sullivan's "plantation" statement may be considered as evidence of pretext.

There is not a clear nexus between the statements by Phillip Sullivan during his first days as manager and Darrel Amour's eventual discharge on February 1, 2002. Although many of these statements were directed at Erica Betts, they may be viewed as evidence of racial discrimination against the African American employees in general. The evidence indicates that his statements were widely circulated among the employees at Costco and, arguably, may have contributed to a racially charged atmosphere.  In addition, these statements were buttressed with instances of perceived offensive and discriminatory conduct toward African American employees. The 2% Plaintiffs described a number of instances in which African American employees were treated differently from their white counterparts.  For example, Stephanie Lewis noticed that (1) African American employees, such as Sonja St. Clair, were constantly being watched by their supervisors with greater intensity than the other staff personnel, and (2) African American customers received more scrutiny than white customers when they purchased expensive items.  ( Lewis Dep. at 143-44, 157.)

Moreover, Darrel Amour denies Costco's allegation that he violated the Company's policy by changing employees' time entries. According to him, the practice was tacitly accepted and adopted by his fellow workers and management alike. In fact, Darrel Amour maintains that he only performed his job in a manner that was encouraged by his supervisors. Thus, the evidence, when viewed in the light most favorable to Darrel Amour, suggests that he was following an unwritten practice – rather than the written policy – which governed the Company's payroll practices.  This allegation, if true, indicates that the reasons for his termination were not legitimate. Darrel Amour also challenges the specific instances in which he was accused of changing time entries for

31

employees.[17]

Costco does not provide a substantive retort to this argument, except to note that Darrel Amour is merely seeking to "explain his conduct after the fact."  Def.'s Reply Br. to Amour Resp. Br. at 7. Moreover, Costco, in maintaining that it had an "honest belief" that Darrel Amour had falsified the Company records, asserts that its legitimate nondiscriminatory reason should prevail over his purported claims of pretext.  *See Braithwaite v. The Timken Co.,* 258 F.3d 488, 494 (6th Cir. 2001) (to show pretext, employee must show that employer did not "honestly believe" in proffered non-discriminatory reason for its adverse employment action).

In *Braithwaite*, the plaintiff, an African American employee, was terminated for fighting in violation of Company's policy.  *Id.* at 492.   In rejecting Braithwaite's claims of pretext, the Sixth Circuit opined that he had failed to present any "material evidence" upon which to support his argument that the employer's proffered reason for his dismissal was, in truth, based on racism and did not represent a "honestly held" belief.  *Id.* at 494.

Here, by contrast, Darrel Amour has presented material evidence of pretext which challenges the "honest belief" in the proffered reason that has been advanced by Costco.  The statements of Phillip Sullivan and others on the Costco managerial staff, when combined with evidence of payroll customs and Darrel Amour's specific challenges to his alleged misconduct, support the view that a reasonable jury could find evidence of racism behind the employer's adverse decision to discharge him.

Finally, the parties have presented conflicting evidence about Dawn Maas, who replaced

_____

[17]Costco claims that he changed the time entry for April Washington without seeking approval from her supervisor. ( Amour Dep., Ex. 6).  Darrel Amour points out that he was Washington's supervisor.  He also challenges Costco's allegations that there were other instances when employee time sheets were falsified by him.  He points out that a bakery manager, Ray Sey, provided him with the  authorization for the time changes of Michaela Wesolowski on November 21 and November 23, 2001. (Amour Resp. Br., Ex R.)

Darrel Amour,  According to the law in the Sixth Circuit, a plaintiff may establish pretext by showing that he was treated differently than similarly-situated employees who are or were outside of the protected class. *See Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).  Here, Darrel Amour contends that Costco applied different standards to him and other African American employees when it promoted Dawn Maas to the position of a payroll administrator. In various audit reports that were attached to his response brief, Darrel Amour claims that these documents reflect some of the unauthorized time entries by her, all in violation of Company policy. [18]  Costco responds by presenting an affidavit by Terri McDaniel who says that Exhibit J actually paints a different picture from that which has been portrayed by Darrel Amour.[19] Terri McDaniel's affidavit, if anything, demonstrates that a genuine issue of a material fact exists on this issue.  The difference of opinion, as reflected by Terri McDaniel's affidavit and Darrel Amour's assertions, suggests that such a credibility analysis should be left for the jury.

In the end and after considering all of the evidence presented by Darrel Amour, this Court concludes that he has submitted a genuine issue as to whether (1) Costco's explanation for Darrel Amour's discharge was "false" and (2) racial considerations were the real reasons for his termination.  *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).

---

[18] For example, Darrel Amour points to Exhibit J which, in his opinion, demonstrates that "Dawn Maas chang[ed] Michaela Wesolowski's time card on December 15, 2001 increasing it by five hours." .

[19] Terri McDaniels avers that "Michaela Wesolowski's first "swipe" on December 15, 2001 was at 12:00 ("as indicated in the "Time In" column).  The "Time Out" column, however, shows "0:00," which means Wesolowski did not swipe her card a second time that day.  From the change made relating to Wesolowski's December 15, 2001 time, the ATS Report shows that 1200 was actually her "Time Out," rather than her "Time In" for the day, and that her actual time worked that day was from "7:00" to "12:00."  Therefore, Dawn Maas did not *increase* Michaela Wesolowski's time; rather, Wesolowski's start time was inserted to reflect the actual hours worked."   McDaniel Decl. II ¶ 6

The 2% Plaintiffs maintain that the investigation which was conducted by Costco, through the leadership of DiLeo and McDaniels, was flawed by racial animus. Specifically, they submit that the Company's investigations into the 2% rebate scheme and the impositions of discipline were racially discriminatory. They complain that the Company made unjustifiable distinctions in its investigative approaches between its African American and white staff members. Nicola Barnes and Darrin Whitehead collectively recall that their respective explanations were rejected by DiLeo and McDaniels without justification whereas this same investigation team accepted the reasons of a white co-worker who, by comparison, had a much more extensive and unusual purchasing history than either of them.(Barnes Dep. at 278.) (Darrin Whitehead Dep. at 117.)[20]

Costco disputes these charges, contending that every aspect of its investigation was conducted in a race-neutral manner and was designed to identify only those persons who had abused their working privileges. The Company also points out that there were some staff personnel - African American and white - were investigated and not subjected to any disciplinary action by the Company.

The evidence which appears in this record suggests that the manner in which the 2% rebate investigation was conducted was not based entirely on an objective criteria. Rather, it appears to have been based, in part, on the subjective criteria of Terri McDaniel and other Costco managers. In addition, this evidence, especially when viewed in a light that is more favorable to the 2%

---

[20]As an example, they point to Angela Brasch who had 35 purchases in fiscal year 2001 which totaled $2,497.00. They also note she made 45 purchases (totaling $3217.00) during the first four months of the fiscal year 2002, (2% Pl.'s Resp. Br., Ex 19.)  However, Terri McDaniel chose not to investigate her beyond Step One because she and Paul DiLeo "found out that Angela has a husband who has a very steady job who has an American Express card.  And they were doing a lot of shopping at Costco, but all the transactions were done on American Express and were signed off by her and her husband."  (McDaniel Dep. at 33-34.)  Based on this knowledge, Terri McDaniel and Paul DiLeo decided that they did not need to interview her.  ( McDaniel Dep. at 33-34.)

Plaintiffs, suggests that white employees were treated differently from, and more favorably than, African American employees during this investigation process. Thus, the 2% Plaintiffs have identified a genuine issue of a material fact as to whether Costco made a "reasonably informed and considered decision that demonstrates an honest belief in the proffered reason for the adverse employment action. *Braithwaite*, 258 F.3d at 494.

Although the written admissions of responsibility by the discharged employees facially support Costco's reasons for terminating them, the 2% Plaintiffs have presented a sufficiency of evidence that their interviews were coercive in nature, especially when considering the accusations of discriminatory treatment by Darrin Whitehead and Stephanie Lewis. (Whitehead Dep. at 132) (Lewis Dep. at 111) This evidence must be considered when evaluating the significance, if any, of the statements that were written by the 2% Plaintiffs at the conclusion of their interviews.

These 2% Plaintiffs also testified that it was a common practice among the employees to borrow each other's membership cards, all in presumptive violation of Costco's written policy. (Whitehead Dep. at 63-66) (Barnes Dep. at 96-98.) (Thomas Dep. at 63-64) This, they submit, is clear evidence that the proffered reasons by the Company for their terminations were pretextual. The deposition testimonies of Debra Blake, Barbara Wade and Michael Talbert also support the 2% Plaintiffs' proposition that all - or virtually all - of the staff at Warehouse 390 unilaterally disregarded the Company's policy relating to an employee's use of membership cards in favor of a different approach. (Talbert Dep. at 63-66.) (Blake Dep. at 2-3) (Wade Dep. at 11)

Although the sharing of membership cards was contrary to the official policy of the Company, only the 2% Plaintiffs, Will Schindorff and Evelyn Gray were terminated. Costco points out that none of the white employees, who were investigated but not disciplined, admitted to using their cards for non-employee members' purchases. Thus, it is Costco's position that the misappropriation of non-employee members' purchases was the ultimate reason for the 2%

35

Plaintiffs' termination.[21]

To support its position on this issue, Costco cites *Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) and *Braithwaite* for the proposition that because it has an honest belief in the proffered reason for the challenged employment decisions, this motion for summary judgment must prevail. In *Smith*, the Sixth Circuit noted that even if an employer has presented some facts which support an "honest belief" for its decision to investigate and terminate an employee, such evidence may be rebutted. *See Smith,* at 807 (6th Cir. 1998) ( " protection afforded by the [honest belief] rule is not automatic. ...[O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce proof of the contrary.")

Here, the 2% Plaintiffs have established sufficient evidence to create a genuine issue with regard to the sincerity of the Company's "honest belief."  Given the evidence that white employees were treated differently by Phillip Sullivan, the fact that the 2% Plaintiffs were specifically targeted for their activities supports a finding of pretext.   While this is a close question,[22] this Court finds that the 2% Plaintiffs have presented evidence that is sufficient to raise a question for the jury as to whether the proffered reason for their termination was pretextual.  Given the racially insensitive remarks made by Phillip Sullivan and the racially charged atmosphere that resulted from his comments and actions, this Court finds that the 2% Plaintiffs have presented some material evidence of unlawful discrimination to rebut the legitimate nondiscriminatory reason offered by Costco for

---

[21]Significantly, the Employee Handbook does not distinguish between employee and non-employee member purchases with respect to the 2% rebate.

[22]There is certainly evidence in the record to support Costco's view that Phillip Sullivan did not bear any racial animus toward the 2% Plaintiffs.  For example, the employment records indicate that he promoted Nicola Barnes in September 2001 (Barnes Dep. at 80), Stephanie Lewis in October 2001 (Lewis Dep. at 14), and Darrin Whitehead during the Christmas season of 2001 (Whitehead Dep. at 21-23).  He also authorized Lavearn Thomas to work in the optical department for higher pay than the position merited  (Thomas Dep. at 53-57.)

their terminations.

C.      The Plaintiffs' Hostile Work Environment/Harassment Claims

In order to establish a prima facie case of a hostile work environment claim, an aggrieved party must show that (1) he is a member of a protected class; (2) he was subjected to unwelcome and uninvited overtures by another; (3) these overtures were acts of harassment that were based on race; (4) the harassment had the practical effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of an employer liability. *Newman v. Federal Exp. Corp*., 266 F.3d 401, 405 (6th Cir. 2001). According to the Supreme Court, a hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

The appropriate factors that this Court is urged to consider in harassment litigation when seeking to determine if the claimed misconduct is sufficiently severe or pervasive to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."*Id.* at 23. "The Supreme Court has consistently held that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Newman,* 266 F.3d at 405 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).

Although the racial harassment claims by the Plaintiffs in this action may differ in the details, the substance of their claims is the same. Their collectively point to Erica Betts who was allegedly targeted by Phillip Sullivan for some unwarranted comments. Costco says that these statements by Phillip Sullivan should not be considered by the Court when evaluating this racial harassment claim

since they were only directed at Erica Betts - and not to the other Plaintiffs. This argument is not supported by the case law. Although it is clear that evidence of harassment would be much more severe if the offensive comments were directed at a particular person, *Smith v. Leggett Wire*, 220 F.3d 752, 760 (6th Cir. 2000).

The Sixth Circuit has made it clear that a comment need not be "directed at" a plaintiff in order to constitute an act of harassment. *Johnson v. United Parcel Service, Inc.*, 117 Fed.Appx. 444, 456 (6th Cir. 2004) (unpublished); *see also Jackson v. Quanex Corp.,* 191 F.3d 647, 661 (6th Cir.1999) ("[I]n the sexual harassment context, this Court has deemed probative remarks that demeaned women generally while not demeaning any one woman in particular."). Moreover, in *Quanex*, the Sixth Circuit opined that a plaintiff need not even hear the offensive remarks or witness the unwarranted behavior first-hand in order to allege that these statements or acts contributed to a hostile work environment. *Quanex*, 191 F.3d at 661. Thus, the statements that were not directed at Erica Betts but which make reference to her are sufficiently probative for the Plaintiffs' harassment claims.

The issue of whether any alleged harassment was based on race is a more difficult question for Erica Betts and the other Plaintiffs to answer because some of Phillip Sullivan's comments do not explicitly contain a racial component. While some of his remarks are facially offensive, there are others that are open to interpretation as to whether they are evidence of racial animus. Thus, the question remains is whether such comments, when viewed together, create a hostile work environment that is "severe" and "pervasive." Costco responds in the negative, maintaining that they would - at best - represent "isolated comments" that are insufficient for a finding of harassment. The Sixth Circuit has stated that isolated and sporadic comments constitute harassment only if they are "extremely serious." *Newman*, 266 F.3d at 405. Costco cites a number of unpublished and non-binding cases in which courts have determined that similarly isolated statements do not constitute

38

harassment. *See Dotson v. Norfolk S. Ry. Co.,* 52 Fed. Appx. 655, 659 (6th Cir. 2002) (unpublished

decision) (conduct not sufficiently severe or pervasive where plaintiff alleged that coworker used

initials "KKK" instead of own initials, used word "ungawa" interpreted by plaintiff as derogatory

term, and called coworkers called plaintiff "tar baby."); *Sweezer v. Michigan Dept. of Corrections*,

No. 99-1655, 2000 U.S. App. LEXIS 21251, at *15-16 (6th Cir. 2000) (unpublished) (isolated

comments such as "colored woman," "nigger," "bitch," are more indicative of personality conflict

than racial animus).

The record indicates that Phillip Sullivan made these comments and engaged in conduct that

was thought by many on the staff to have been racially motived during a seven month time period

between July 2001 and  February 1, 2002. Statements and actions that are race-neutral may be

considered as evidence of harassment when evaluated in the totality of the circumstances. *See*

*Johnson v. United Parcel Service, Inc.*, 117 Fed.Appx. 444, 456 (6th Cir. 2004) (race-neutral

statement can be considered as evidence of harassment); *see also Harris,* 510 U.S. at 23 (stating that

the harassment inquiry evaluates the totality of the circumstances; *Landrau-Romero v. Banco*

*Popular De Puerto Rico,* 212 F.3d 607, 614 (1st Cir.2000) ("conduct that is not explicitly racial in

nature may, in appropriate circumstances, be considered along with more overtly discriminatory

conduct in assessing a Title VII harassment claim.") (citation omitted).

More to the point, Costco maintains that Erica Betts has not presented any evidence that she

found the work environment at Warehouse 390 to be difficult or that she reported any misconduct

to Costco authorities.  On the other hand, Erica Betts testified that she made an oral request for a

transfer to David Pierce, an assistant store manager, because "[she] was tired of the harassment."

Betts Dep. at 22.  She also claims to have talked to a front-end supervisor named Jim,[23] and left a

---

[23]She was unable to identify "Jim" by another name.

message for Richard Webb.  Betts Dep. at 26-27.  Erica Betts also testified that prior to being fired, she told Richard Webb that "there is some racist_____ going on at the store and that I'm tired of it."  Betts Dep. at 46.[24]  Thus, viewing the facts in a light that is most favorable to the Plaintiffs, there is evidence that she reported or attempted to report evidence of harassment to the appropriate Costco authorities.

Turning to the issue of employer liability in the State of Michigan, the doctrine of *respondeat superior* is applicable in harassment cases only if the aggrieved parties are able to present sufficient evidence to demonstrate that the employer "failed to rectify a problem after adequate notice. [ ] That is, whether defendant failed to take prompt and appropriate remedial action after receiving adequate notice that [defendant's employee] was ... harassing plaintiff...." *Chambers v. Trettco, Inc.,* 614 N.W.2d 910, 919 (Mich. 2000) (internal citations omitted).

Darrel Amour focuses his attention on the "plantation" comment, as well as the "bitch" and "houseboy" statements by Darrin Schaefer  Although one of his comments may lack the requisite connotation to constitute evidence of a racially discriminatory animus, the other statement can be logically viewed as a racial comment.

The 2% Plaintiffs focus their attention on many of the same comments that were the subject of Erica Betts' complaints against her former employer.  They also submit that Costco, through the efforts of Phillip Sullivan, (1) harassed its African American employees and customers, (2) treated African American customers differently than white customers when they attempted to return their purchased items to the store, and (3) wanted African American customers to be scrutinized more closely than their white customer counterparts when they used checks to pay for the merchandise.

In view of these accounts, this Court finds that there is sufficient evidence that Darrel Amour

---

[24]Erica Betts also claims that she attempted to speak to James Sinegal, the President and CEO of Costco in the State of Washington.

and the 2% Plaintiffs experienced a racially hostile work environment at Costco.  Although Costco criticizes the "subjective and conclusory nature" of these allegations, this Court believes that the issues of credibility should be presented to, and  addressed by, the jury.  This Court also finds that, when viewed in the light most favorable to the Plaintiffs, Phillip Sullivan's alleged statements and actions rose to the level of severity and pervasiveness necessary to constitute a hostile work environment.

As for the final prong, and with recognition that Erica Betts claims to have attempted to communicate with various Costco management authorities about race and Phillip Sullivan, as well as the hostile work place, this Court finds that the 2% Plaintiffs and Darrel Amour have satisfied the requirement for employer liability.[25]

D.     Negligent Supervision

The Plaintiffs do not contest Costco's argument that their negligent supervision claims are preempted by Michigan's Workers' Disability Compensation Act, Mich. Comp. Laws § 418.131; *see Downer v. Detroit Receiving Hosp.*, 477 N.W.2d 146, 148 (Mich.Ct. App. 1991).  Accordingly, this claim must be dismissed.

IV.     Conclusions

For the reasons that have been stated above, this Court (1) grants Costco's motion for the entry of a summary judgment as to all the Plaintiffs in connection with  their negligent supervision claim, and (2) denies the Company's motion for summary judgment on the Plaintiffs' claims for racial discrimination and hostile work environment.

IT IS SO ORDERED.

_____

[25]Darrel Amour presented evidence that he spoke to Terri McDaniel about Schaefer's "houseboy" comment, but that she did not report the comment to Sullivan because she was in fear for her job.  (Amour Dep. at 72.)

41

Dated:  October 11, 2005                            s/ Julian Abele Cook, Jr.
        Detroit, Michigan                      JULIAN ABELE COOK, JR
                                        United States District Court Judge


Certificate of Service

I hereby certify that on October 11, 2005,  I electronically filed the foregoing with the Clerk of the
Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                        s/ Kay Alford
                                        Courtroom Deputy Clerk