

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

JUL 27 2006

CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

ERICA BETTS, STEPHANIE LEWIS, DARRIN
WHITEHEAD, LAVEARN THOMAS, DARREL
AMOUR and NICOLA BARNES,

   Plaintiff,

Case number 02-73435
Honorable Julian Abele Cook, Jr.

v.

COSTCO WHOLESALE CORPORATION,

   Defendant.

## JURY INSTRUCTIONS

1

I shall now read a set of instructions which will incorporate the law that must be applied and followed by you as jurors. Moreover, these instructions contain some general guidelines that are designed to assist you in resolving all of the issues in this case.

You should disregard any obvious typographical or grammatical errors, as well as any perceived facial expressions or voice inflections that may have been evidenced by me during the course of this trial or during my reading of these instructions.

Finally, if I fail to read a word or in the event that a word is inserted by me which does not appear in these instructions, each member of the jury should ignore this error unless you are given specific instructions to the contrary.

2

Any reference to *he, his,* and *him* within these jury instructions should be construed by you as having equal applicability to any female participant in this trial. The utilization of these masculine pronouns has been used by me only for my ease in reading these instructions and not for the purpose of giving emphasis to, or providing focus upon, any witness or particular aspect of this case.

3

The law that you are to apply in this case is contained in these instructions. As such, it is your duty to follow them. You must consider them as a whole and not select one or some of the instructions and disregard others. Moreover, you are not to be concerned with the wisdom of any rule of law that I have included within these instructions. Regardless of any opinion that you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law which is different from my instructions. In fact, it would

also be a violation of your sworn duty - as judges of the facts - to base a verdict upon anything other than the evidence in this case. Justice must always depend upon the willingness of each member of the jury to determine the facts from the same evidence, and to arrive at a verdict by applying the same rules of law.

At the conclusion of my reading these instructions, I will direct you to go to the jury room, deliberate and reach a unanimous verdict. It is extremely important to remember that your faithful performance as jurors is always vital to the administration of justice.

4

No statement, ruling, remark or comment that I may have made during the course of this trial is intended to indicate my opinion as to how you should decide the case or to influence you in your assessment of the facts. However, if you think that I have, you should disregard this notion because you, as members of the jury, are the exclusive judges of the facts in this case.

5

It is your duty to determine the facts from all of the evidence that has been admitted by me during this trial. You are to apply the law to these facts, and in this way, decide each contested issue in the case. Always remember that sympathy, prejudice, or public opinion must never influence any of your decisions as they relate to the respective positions of the parties in this case.

6

If you perceive any difference between the law that was or may have been mentioned by either of the attorneys during their closing arguments and the law within my instructions, you must always be governed by my interpretation and declaration of the law.

7

This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations of life. As such, all persons, including corporations, stand equal before the law. It is your duty to decide the case with the same impartiality that you would use in deciding a case between two or more individuals.

8

The burden of proof is upon each of the Plaintiffs (Erica Betts, Stephanie Lewis, Darrin Whitehead, Lavearn Thomas, Darrel Amour, and Nicola Barnes) to establish every essential element of their respective claims against the Defendant (Costco Wholesale Corporation) by a preponderance of the evidence. For the sake of brevity in my presentation of these instructions, I shall refer to the six Plaintiffs collectively as "the Plaintiffs" and to the Defendant as "Costco."

9

The term, *burden of proof*, means that the evidence must satisfy you that the proposition on which each party has the burden of proof has been established by the evidence which outweighs the evidence against it. You must consider all of the evidence regardless of which party produced it.

10

The term, *preponderance of the evidence*, means such evidence as, when considered and compared with that opposed to it, has a more convincing force and produces in your mind a belief that what is sought to be proven is more likely true than not true. In order to satisfy this standard by a preponderance of the evidence, each of the Plaintiffs are required to prove that their respective claims are more likely true than not true.

11

In evaluating the merits of the parties' respective positions, you should consider the testimony of each witness, every stipulated fact, and all of the exhibits that have been admitted into evidence. From time to time, it has been my duty as the judge in this trial to make rulings on the admissibility of evidence, all of which are governed by rules of law. Therefore, you must neither challenge nor concern yourselves with the reasons for my decisions.

12

There are two types of evidence from which you may find the truth as to the facts of a case - direct and circumstantial evidence.

*Direct evidence* is the testimony of one who claims to have actual knowledge of a fact, such as the statement by an eyewitness. On the other hand, *circumstantial evidence* is the proof of a fact from which you may infer or conclude that other facts exist.

As you collectively evaluate all of the facts in this case, keep in mind that the law makes no distinction between the weight to be given to direct or circumstantial evidence. No greater degree of certainty is required of circumstantial evidence than of direct evidence. In determining whether any fact has been proven, you should consider all of the evidence which relates to that fact without regard to which party produced the evidence.

13

The law does not require the Plaintiffs or Costco to call everyone as a witness who may (1) have been present at any time or place involved in the case, or (2) has some knowledge about the matters at issue in this law suit. Moreover, the law does not require either party to produce every document, paper, or object that was mentioned during the trial.

14

In your evaluation of the evidence, you are not limited to what you see or hear from the witnesses. Thus, you have a right to consider all of the evidence in the light of your own general knowledge and experiences in life, and to take into account whether any particular evidence seems reasonable and probable. As such, you are permitted to draw any reasonable inferences from those facts that were produced during the course of this trial. However, if you have any personal knowledge of a particular fact in this case, it must not be used as evidence.

15

You must never consider any evidence that has not been admitted during the course of this trial unless specifically authorized by me for your examination and evaluation. In addition, you must not attempt to conduct any independent investigation of the facts in this case, discuss the issues with anyone who has not been approved by me, or bring any written material (such as books, records, or files) into the jury room that may have some reasonable relationship with this case. If you fail to strictly adhere to these precautionary rules, it would constitute a violation of your sworn duty to serve as objective and unbiased jurors and judges of the facts.

16

As the sole judges of the facts in this case, you must determine which witnesses to believe and the weight, if any, that you will give to their testimony. In doing so, you may take into account (1) each witness' ability and opportunity to observe, (2) his memory, (3) his manner while testifying, (4) his interest, bias, or prejudice, if any, and (5) the reasonableness of his testimony when considered in the light of all the evidence in the case.

17

You will recall that some of the evidence was presented to you through the use of a

deposition. A deposition is a record of the sworn testimony of a witness that was taken in the presence of an authorized person, such as a court reporter. The parties to this law suit and their attorneys had a right to be present during the deposition and to ask questions of the witness. This deposition evidence should be evaluated by using the same standard and objective consideration that you have given to every witness who appeared and gave testimony in your presence in this courtroom.

18

A party or witness may be discredited or impeached by one or more of the following methods: (1) contradictory evidence, (2) evidence that the witness has said or done something at some other time or has failed to say or do something which is inconsistent with his testimony during the trial, (3) a showing that he testified falsely concerning a material matter, or (4) evidence that his general reputation for truth and veracity is bad in the community where he now resides or has recently resided. If it is your collective belief that any party or a witness has been impeached, it is within your exclusive authority to give his testimony such credibility or weight, if any, which you think that it may deserve.

However, you are not required to accept the testimony of any witness, even though his testimony has not been contradicted and he has not been impeached. You may decide that such testimony is not worthy of belief because of his bearing and demeanor, the inherent improbability of his testimony, or for any other justifiable reason.

19

The number of witnesses who testified in this trial should not be a factor in your decision-making process. Putting it somewhat differently, do not make any decisions that are based only on the number of witnesses who testified in this case or the quantity of evidence that

was presented by them. On the other hand, it is extremely important for you to determine (1) the credibility of each witness, (2) the weight, if any, that the testimony of each witness deserves, and (3) the evidence that appeals to your minds as being most accurate and otherwise trustworthy. Concentrate on these factors - not the numbers.

20

It is the duty of an attorney to object when the other side attempts to offer evidence that, in his opinion, is not properly admissible according to the rules and regulations which govern the conduct of this trial. Therefore, you must never permit any form of prejudice against him or either of the parties to enter your decision-making process because he made an objection.

If I sustained an objection to a question during the course of this trial, you must disregard the question entirely, and not draw any inference from the wording of the question or speculate as to what the witness would have said if he had been permitted to answer the question. On the other hand, if I overruled the objection, you should evaluate the witness' response just like any other answer to a question. Upon allowing the testimony or a document to be introduced over an objection, this decision should never be construed by you as representing an expression of my opinion as to the weight or the effect that should be given to the evidence.

Always remember that you - as members of the jury - are the sole judges of the credibility of all witnesses, as well as the weight and effect of all evidence.

21

If a witness is a party to the case, and by a statement or some other conduct, admits or acknowledges a fact or a set of facts against his interest, then this statement or other conduct - if it was knowingly made or done by him - may be considered by you as evidence of the truth of the fact or the set of facts that have been admitted, as well as for the purpose of judging his

credibility.

An act or omission is *knowingly* made if it is done voluntarily and intentionally, and not because of a mistake, an accident, or some innocent reason.

22

I am aware that some of you may have taken notes during the trial. However, a word of caution is in order. There may be a tendency among some of you to attach undue importance to those matters that have been recorded by one juror in his notes. Some of the testimony, which was not recorded by a juror because it was thought to be unimportant at one time, may take on greater importance at a later time in the trial when all of the evidence in the case is considered and evaluated by you and the other members of the jury. Therefore, your notes and those of the other members of the jury should be used only to supplement your own memory.

To those members of the jury who have not taken notes, you should rely upon your own independent recollection of the evidence and refrain from being unduly influenced by the writings of the other jurors. Moreover, you should not compare your notes with the other jurors when attempting to determine the content of any testimony or in assessing the importance of any evidence.

It is extremely important to remember that your notes are not evidence. Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

23

Keep in mind that the arguments and remarks of the attorneys do not constitute evidence. Therefore, you should disregard any statement by an attorney that is not supported by the facts in this case or by your own general knowledge and experience. However, if a party or his

attorney admits or stipulates to the existence of a particular fact, you must (1) accept the admission or stipulation as being competent evidence, (2) regard this fact as having been established for the purpose of the trial, and (3) assign such weight, if any, to the admission or stipulation that you believe to be appropriate.

### 24

Finally, it is ethical and proper for one or more of the attorneys in this case to meet, talk, and consult with any witness in preparation for this trial.

### 25

This concludes my general instructions to you. I shall now turn to a discussion of the Plaintiffs' claims against Costco, all of which you will be called upon to evaluate and resolve.

### 26

Inasmuch as there are six Plaintiffs, you must give separate and distinct consideration to each of their claims in this case. As such, it does not follow that if, in your opinion, one of the Plaintiffs is entitled to receive damages for his claim of racial discrimination, all of the remaining claimants should also recover. Rather, it is obligatory upon each Plaintiff to prove every element of this claim by a preponderance of the evidence.

### 27

The law in the State of Michigan provides that an employer shall not discriminate against a person regarding his employment, compensation, or a term, condition, or privilege of employment because of race. In this law suit, each of the Plaintiffs specifically contend that Costco violated a State of Michigan statute, commonly known as the *Elliot-Larsen Civil Rights Act*, which prohibits, among other things, all acts of racial discrimination in employment.

28

The *Elliott-Larsen Civil Rights Act*, which is codified under Michigan Compiled Laws section 37.2202(1), states, in pertinent part, that "[a]n employer shall not . . .(a) discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race . . . ."

29

In this case, all of the Plaintiffs have asserted that Costco (1) unlawfully terminated their employment, and (2) created a hostile work environment because of their race. Costco has denied all of these allegations.

In order for each of the Plaintiffs to prove their respective claims of racial discrimination, they must establish that Costco treated them less favorably than similarly situated non-African-American employees because of their race.

To make this comparison, every Plaintiff must demonstrate that he and the employee with whom he compares himself are similarly situated. Thus, he must demonstrate that all of the relevant aspects of the other employee's employment situation were nearly identical to those of his own employment situation. Under such circumstances, a Plaintiff must prove that the individual, with whom he seeks to compare his treatment, (1) dealt with the same supervisor, (2) was subjected to the same standards, and (3) had engaged in the same conduct without any differentiating or mitigating circumstances that would distinguish or explain the other employee's conduct or treatment by Costco.

30

The Plaintiffs also have the responsibility of proving by a preponderance of the evidence that they were subjected to unlawful acts of discrimination by Costco because of their race. The

claimed acts of discrimination must have been intentional. It cannot have occurred by accident.

As used in this case, the words, intentional discrimination, mean that one of the motives or reasons for the Plaintiffs' discharge was race. Race does not have to be the only reason, or even the main reason, but it does have to be one of the reasons that made a difference in determining whether or not to discharge the Plaintiffs.

31

As each Plaintiff's claim of discrimination is evaluated by the jury, the issue of race may be inferred as a reason for his termination if you find that the claimed discriminatory statements or actions were made by persons within the management at Costco who were involved in the decisions to terminate him. However, you may not infer that race was a reason for Costco's decision to terminate a Plaintiff's employment because of discriminatory statements, conduct or actions by decision-makers, if any, that are unrelated to his discharge in the absence of some other evidence of an unlawful intent by the employer.

32

We shall now turn to the Plaintiffs' hostile work environment claim against Costco. As noted earlier in these instructions, you must give separate and distinct consideration to each Plaintiff's claims in this case. As such, it does not follow that if one Plaintiff is entitled to receive damages for his claims of hostile work environment, all of the remaining claimants are also entitled to recover. Rather, it is obligatory upon each Plaintiff to prove every element of his claim by a preponderance of the evidence.

33

On this issue, it is the contention of each Plaintiff that Costco, through its management personnel, subjected them to a hostile work environment because of their race. In order to

establish their hostile work environment claims, they must prove all of the following elements:

(1)    he is a member of the protected class;

(2)    he was subjected to unwelcome racial harassment;

(3)    the harassment was based on race;

(4)    the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and

(5)    the existence of employer liability.

34

You should be aware that the parties collectively agree that all of the Plaintiffs are members of a protected class. Hence, the first element of their burden of proof has been established. No further proof is necessary. However, the Plaintiffs have an obligation to prove all of the remaining elements by a preponderance of the evidence.

35

In considering whether the Plaintiffs have satisfied their respective burdens of proof, you should evaluate this hostile work environment question by exploring these claims from a totality of circumstances point of view. For instance, you may seek to (1) explore the frequency and the severity of the alleged discriminatory conduct, (2) determine if the claimed misdeeds by Costco were physically threatening, humiliating, or merely an offensive utterance, and (3) evaluate whether the alleged misconduct by the management personnel at Costco constituted an unreasonable interference with the Plaintiffs' work performance.

36

Costco cannot be held liable for the intentional acts that were committed by an employee whose actions or conduct are beyond the scope of its business. Thus, if you find that a

management employee, who has been charged with acts of discriminatory conduct by one or more of the Plaintiffs, did not act within the scope of his employment, Costco cannot be held responsible for this conduct.

37

Each Plaintiff must establish that the alleged offensive behavior was directed at him because of his race.  In order to establish that the alleged harassment was racially motivated, each Plaintiff must prove by a preponderance of the evidence that but for his being of African American heritage, he would not have been the object of unlawful harassment.  However, you should be aware that simple teasing, offhand comments, and isolated incidents (unless extremely serious) does not constitute a hostile work environment.

38

The work environment at Costco, about which the Plaintiffs have complained, must be shown to have been objectively and subjectively offensive.  It is not enough for any of the Plaintiffs to have been merely offended by their working conditions. Rather, every Plaintiff in this law suit has the burden of providing evidence of incidents that were sufficiently severe and pervasive that a reasonable person would have also found the environment to have been hostile or abusive.

39

The Plaintiffs must also prove that Costco had adequate notice that they were being harassed by its management personnel.  To prove adequate notice, they must produce evidence that any reasonable employer, especially when viewed from a totality of the circumstances perspective, should have been aware of the racial harassment being practiced against them. General reports that something was wrong is not an adequate notice of a racially hostile work

environment.

If you find that Costco, after having been given adequate notice, failed to investigate and undertake prompt and appropriate remedial action, then your verdict must be for him.

40

An employer is entitled to create its own policy and to implement its business decisions. You must not to substitute your judgment for Costco's business judgment or decide this case on the basis of what you would have done under similar circumstances. Instead, your focus should be on Costco's motivation and not on the correctness or incorrectness of its business judgments. You may also consider the reasonableness or lack of reasonableness of the stated business judgments along with all of the other evidence in determining whether Costco did or did not intentionally discriminate against any or all of the Plaintiffs on the basis of their race.

41

Costco must establish their reliance upon the particular facts about which they were aware at the time that the decisions to discharge the Plaintiffs were made. It is not enough for any of the Plaintiffs to show that they were treated unfairly or that Costco made an incorrect business decision. Rather, each one of them must prove that they were subjected to intentional acts of race discrimination by Costco.

42

If a preponderance of the evidence supports any of the respective claims of unlawful racial discrimination or the maintenance of a hostile work environment, you should find in favor of the prevailing Plaintiff (or Plaintiffs) and against Costco. On the other hand, if any of the requisite elements are not proven by a preponderance of the evidence, your verdict must be in favor of Costco and against the Plaintiff (or Plaintiffs).

43

This concludes my discussion of the Plaintiffs' claims in this case. If it is your conclusion that one or more of the Plaintiffs have proved their claims against Costco by a preponderance of the evidence, you should turn your attention to my instruction relating to the issue of damages. However, my discussion about damages should not be construed by you as suggesting, implying or indicating that I have an opinion as to whether any or all of the Plaintiffs are entitled to receive the relief that they seek in this lawsuit. The issue of damages is a matter that is exclusively within your province as judges of the facts.

44

You should award only those damages that will adequately compensate the Plaintiffs for any losses that were incurred by them as a result of Costco's alleged unlawful conduct. It is important to note that your award of damages must always be fair and reasonable.

45

The Plaintiff's claims in this case includes two distinct types of damages which you must consider separately.

First, you should determine the amount of any wages and fringe benefits that the Plaintiffs would have earned during their employment with Costco if they had not been discharged *minus* the amount of earnings and benefits that were received by them from subsequent tenures of employment.

Second, you must assess the amount of the damages, if any, that were sustained by the Plaintiffs for the pain, suffering, emotional distress, or mental anguish that can be reasonably attributed to the claimed mistreatment by Costco.

In rendering your verdict, you must enter separate amounts for each type of damage in

the verdict form. However, in doing so, you must not include the same item in more than one category.                                   46

No evidence of a monetary value of such intangible things as pain and suffering need be introduced into evidence. There is no exact standard for fixing the compensation to be awarded for these elements of damages. Any award that you make should be fair and reasonable in light of the evidence presented at trial.

47

You should use your sound discretion in determining an award of damages, drawing reasonable inferences from all of the facts in evidence. The law places a responsibility upon each Plaintiff to prove those facts that will enable you to arrive at the amount of damages with a reasonable degree of certainty. On the other hand, the law does not require any of the Plaintiffs to prove the amount of their losses with any mathematical precision. Rather, the law only requires them to support their respective claims for damages with only as much definiteness and accuracy as the circumstances will permit.

48

Your verdict must be designed to compensate the Plaintiffs for their losses, and not to punish Costco. Compensatory damages are not allowed as a form of punishment, and cannot be imposed or increased to penalize their employer.

49

If you determine that a Plaintiff would have been lawfully discharged because of some conduct by him, then your calculation of damages (i.e., lost wages and benefits) must stop at the time when Costco first learned of his alleged misconduct.

50

The law requires each Plaintiff, after being terminated by Costco, to mitigate his own damages by making every reasonable effort to seek and obtain other employment opportunities. Under these circumstances, it becomes incumbent upon Costco to prove that the Plaintiffs had failed to mitigate their damages. If you determine that a Plaintiff is entitled to receive damages, you must reduce this figure by those sums of money that were earned by him since leaving his employment with Costco.

The word, *mitigate,* as used in this case, refers to a doctrine which the Plaintiffs, all of whom claim to have been damaged by Costco's adverse administrative decisions, to make every reasonable effort to alleviate or reduce his losses.

51

If you conclude that the Plaintiffs have suffered damages, you should determine when those damages accrued, and add interest from that date until August 26, 2002, the day on which their Complaint was filed with this Court. In your assessment of the Plaintiffs' claims for damages, you must not take into account such issues as attorneys' fees or court costs in determining the amount of damages.

52

This concludes my discussion relating to the subject of damages

53

The parties have agreed upon the existence of certain facts, all of which should be treated by you as having been established for the purpose of this trial. However, the weight, if any, that should be assigned to these stipulated facts is for you to decide. These stipulated facts have been attached to, and made an integral part of, this set of instructions. So, it is absolutely

imperative that you read and fully comprehend all of these stipulated facts before commencing your deliberations.

54

Finally, let us now review some of the basic rules regarding your conduct during the deliberations.

55

When you go to the jury room, your deliberations should be conducted in a businesslike manner. You should initially select a foreperson who will have the responsibility of making certain that the discussion goes forward in a sensible and orderly fashion, with each member of the jury being given every reasonable opportunity to discuss the issues fully and fairly.

56

When every member of the jury agrees upon all of the contested issues in this case, it will be received as your verdict. Thus, your verdict must be unanimous.

57

Before deciding the case, you should give an impartial and respectful consideration to other viewpoints and discuss your differences of opinion in a spirit of fairness and frankness. In your discussion, every one should feel free to express an opinion on any issue which relates to this case, as well as the facts and reasons upon which you base it. No one, who is not a member of this jury panel, will be allowed to hear your discussions in the jury room, and no record will be made of what is said. So you should feel free to speak your minds.

In the course of your deliberations, do not hesitate to change an opinion if you are convinced that it is wrong. However, none of you should surrender your honest belief regarding the weight and effect of the evidence, or lack of evidence, solely because of the views of your

fellow jurors or for the mere purpose of returning a verdict.

58

You may take your copy of these instructions into the jury room. If you have any questions about the law or your duties as jurors, you should first consult my written instructions. You are also entitled to take the exhibits into the jury room and to examine them at your leisure.

If you want to see any of the exhibits that are not in your possession, you should forward a written request to me and identify the desired documents or information.

59

I ask you to take the verdict form, which has been prepared for your convenience, to your jury room. When all of the members of the jury have agreed upon a verdict, your foreperson should complete the form, including the date and his signature. Once this form has been completed, please advise me in writing that you have reached unanimity on all of the contested issues in this case.

However, I hasten to add that you must not advise anyone, who is not a member of the jury, of your decision about any of the issues in this case or the nature of your deliberations until such time as you are requested to do so by me in this courtroom.

When you are asked to return to the courtroom after reaching a verdict, your verdict form should be given to the foreperson who will be asked to announce the decision of the jury to the parties when called upon to do so by me. Please note that this verdict form is a separate instrument and, as such, it does not constitute any part of the jury instructions.

60

It is also proper to add the caution that nothing within these instructions and nothing in the verdict form is meant to suggest the decision that you should make in this case. If, for any

reason whatsoever, you believe that these instructions, verdict form or my comments and demeanor may have created such an impression, it should be disregarded immediately because the collective decision of the jury must always remain your sole and exclusive duty and responsibility as jurors.

61

You should note from the oath that will be taken by a member of my staff in a few minutes that everyone is forbidden to communicate with any member of the jury on any subject that touches upon the merits of this trial. Also bear in mind that you must never reveal to anyone how the jury stands numerically or otherwise on the issues in this case until a unanimous verdict has been reached, and I specifically ask you to disclose your decision in the presence of the parties in my courtroom.

62

Remember, at all times, that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case. This marks the conclusion of my jury instructions.

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERICA BETTS, STEPHANIE LEWIS,
DARRIN WHITEHEAD, LAVEARN
THOMAS, DARREL AMOUR and
NICOLA BARNES,

              Plaintiffs,

v.

COSTCO WHOLESALE CORPORATION,

              Defendant.

Case No. 02-73435

Judge Julian Abele Cook, Jr.
Magistrate Judge Carlson

## STIPULATION OF FACTS

Plaintiffs Erica Betts, Stephanie Lewis, Darrin Whitehead, LaVearn Thomas, Darrel

Amour and Nicola Barnes and Defendant Costco Wholesale Corporation have stipulated to the

following facts:

**A.**    **_Introduction._**
    1.     All Plaintiffs were terminated by Defendant Costco on February 1, 2002.

    2.     All Plaintiffs are African American.

**B.**    **_Facts Regarding Costco and Its Membership Card Programs._**

    3.     Costco operates more than 400 membership warehouses, at which it sells brand
         name merchandise to members.

    4.     Only individuals who purchase a "membership card" can shop at Costco's
         warehouses.

    5.     An Executive Membership cardholder is eligible to receive an annual 2% rebate -
         up to $500 per year - on most purchases.

    6.     Each member is given a "membership card" with a membership number.

7.    Costco offers two types of individual memberships: a "Gold Star" for an annual fee of $45 or an "Executive Membership" for an annual fee of $100.

8.    As a benefit of employment, all Costco employees receive an Executive Membership card upon satisfactorily completing a 90 day probationary period.

9.    Members must present their membership cards to enter the warehouse and to the cashier when purchasing items.

C.    *Facts Regarding Warehouse 390 In Livonia, Michigan.*

10.    Costco opened Warehouse 390, located in Livonia, Michigan, in 1998. Until July 15, 2001, Tom Beckman, Caucasian, was Warehouse 390's Warehouse Manager.

11.    On July 15, 2001, Phil Sullivan, Caucasian, became Warehouse Manager at Warehouse 390.

12.    As Warehouse Manager, Sullivan had primary managerial responsibility for Warehouse 390.

13.    Terri McDaniel, Caucasian, was the Administrative Manager at Warehouse 390 during the time of the events at issue in this case.

14.    Costco employs a loss prevention agent at each of its warehouses.

15.    Paul DiLeo, Caucasian, was the Loss Prevention Agent at Warehouse 390 during the time of the events at issue in this case.

16.    Narquita Steanhouse, African American, was a Front End Supervisor at Warehouse 390 during the time of the events at issue in this case.

17.    Greg Brooks, African American, was a Supervisor at Warehouse 391 during the time of the events at issue in this case.

18.    Richard Webb, Caucasian, was Regional Vice President, Midwest Operations during the time of the events at issue in this case.

19.    John Gaherty, Caucasian, was Senior Vice President, Midwest General Manager during the time of the events at issue in this case.

20.    Larry Montague, Caucasian, was Corporate Director of Security during the time of the events at issue in this case.

21.    Craig Jelinek, Caucasian, held two different positions during the time of the events at issue in this case, namely Executive Vice President, Northern Division,

and Executive Vice President, Chief Operating Officer, Merchandising.

**D.    _Costco's Employee Agreement._**

22.    Costco's Employee Agreement sets forth Costco's policies and procedures regarding all areas of employment.

23.    Each Plaintiff signed an acknowledgement form indicating that he/she received and understood the terms and conditions of the Employee Agreement.

24.    Section 2.4 of the Employee Agreement sets forth Costco's anti-harassment policy and states:

> It is Costco's intent to provide a work and shopping environment free from all verbal, physical and visual forms of harassment for employees, members and vendors.
>
> Costco prohibits all forms of harassment, whether due to race, color, national origin, ancestry, sex, sexual orientation, religion, age, disability, veteran status, political ideology, or any other reason.

25.    Section 2.5 of the Employee Agreement states that an employee who believes that he/she is being subjected to discrimination or harassment must promptly notify his/her Supervisor, Manager, Vice President or Home Office Personnel, in accordance with the Open Door Policy as described in section 2.1 of the Employee Agreement.

26.    According to Sections 2.1 and 2.5 of the Employee Agreement, an employee may report harassment or discrimination to his/her Supervisor, Warehouse/Depot/General Manager, Regional Vice President, Senior Vice President, Executive Vice President, Home Office Human Resources Department or the Ombudsman's Office.

27.    Section 11.2 of the Employee Agreement lists actions that are grounds for immediate termination.

28.    Section 11.2(21) provides that one of the grounds for immediate termination is "[e]xtending or receiving unauthorized discounts, refunds, or credits; failure to record sales; ringing up own sales or a family member's sales; working with an open register."

**E.    _Facts Regarding The 2% Plaintiffs._**

29.    Costco hired Plaintiff LaVearn Thomas on March 17, 1998 as a Front End Assistant.

30.    Shortly after Plaintiff Thomas started, she was promoted to a full-time Front End Cashier.

31.    In October 2001, Sullivan transferred Plaintiff Thomas to Warehouse 390's Optical Department where she worked as a full-time Service Assistant.

32.    Costco hired Plaintiff Darrin Whitehead on April 29, 1998 as a Front End Assistant, and promoted him to a Front End Cashier approximately one year later.

33.    Costco hired Plaintiff Stephanie Lewis as a Front-End Assistant in October 1999.

34.    The following year, Plaintiff Lewis became a part-time Front-End Cashier.

35.    In October 2001, Plaintiff Lewis was promoted to a full-time Front-End Cashier.

36.    Costco hired Plaintiff Nicola Barnes as a part-time Front End Assistant on October 19, 1999.

37.    In September of 2001, Barnes was promoted to a full-time Front End Cashier.

38.    In January 2002, an investigation was conducted at Warehouse 390 into whether employees were misusing their Executive Membership cards.

39.    The investigation of card activity consisted of three steps. In Step 1, DiLeo and McDaniel reviewed a "Member Shopping Inquiry" report for every employee in the warehouse.

40.    This computer-generated report sets forth the number of times an employee has shopped at a specific warehouse during Costco's fiscal year as well as the total dollar amount the employee spent during this time frame.

41.    The report also provides this shopping information for the previous and current fiscal years and thereby allows Costco to compare member purchases from one year to the next. (Costco's fiscal year begins September 1st and ends the following August 31st.)

42.    In Step 2, DiLeo and McDaniel reviewed "Member/Item Activity Inquiry" reports for some, but not all, employees.

43.    DiLeo and McDaniel looked for three types of purchases which could possibly indicate misuse of a membership card: (1) big ticket items, (2) unusual purchases, or (3) repetitive shops in one day.

44.    In Step 3, DiLeo and McDaniel printed and reviewed duplicate receipts and

associated credit card signature slips.

45.    After identifying the questionable transactions, Sullivan, DiLeo, and McDaniel sent the investigation documents to Richard Webb, Regional Vice President, Midwest Operations, and John Gaherty, Senior Vice President, Midwest General Manager, for their review.

46.    Based on the data set forth in the investigation documents, Webb and Gaherty authorized interviews of the employees associated with the questionable transactions.

47.    Sullivan, DiLeo, and McDaniel asked Brooks to assist in the interviews.

48.    Sullivan, DiLeo, McDaniel, Brooks, and Barbara Wade (Warehouse 390's Front End Manager at the time, and thus the manager ultimately responsible for overseeing the Front End Cashiers and Assistants) broke into smaller groups and interviewed the employees.

49.    On January 28, 2002, Plaintiff Thomas was interviewed by Phil Sullivan, McDaniel, and Brooks.

50.    On January 28, 2002, Plaintiff Whitehead was interviewed by Wade and DiLeo.

51.    On January 28, 2002, Plaintiff Barnes was interviewed by DiLeo and McDaniel.

52.    On January 28, 2002, Plaintiff Lewis was interviewed by DiLeo and McDaniel.

53.    On January 28, 2002, Plaintiff Darrel Amour was interviewed by Brooks and Sullivan.

54.    Based on the results of the investigation, Sullivan recommended to Richard Webb that Costco terminate Plaintiff Barnes, Plaintiff Thomas, Plaintiff Lewis, Plaintiff Whitehead, Will Schindorff, and Evelyn Gray based on their involvement in the 2% scheme.

55.    On February 1, 2002, Plaintiff Barnes, Plaintiff Thomas, Plaintiff Lewis, Plaintiff Whitehead, Schindorff, and Gray were terminated.

## F.    _Facts Regarding Plaintiff Darrel Amour._

56.    Costco hired Plaintiff Amour as a part-time sales auditor on April 15, 1998.

57.    Plaintiff Amour subsequently became Back-Up Payroll Administrator to Warehouse 390's former Payroll Administrator, Kathleen Killory.

58.   When Killory transferred to a different Costco warehouse in May 1999, Plaintiff Amour became Warehouse 390's Payroll Administrator.

59.   At that point, Dawn Maas, Caucasian, became Amour's Back-up Payroll Administrator.

60.   Upon arriving at Warehouse 390, Sullivan identified Plaintiff Amour as a "go to person" in the warehouse based on Plaintiff Amour's leadership qualities, prior experience as an Army Lieutenant and as a former police officer, and the knowledge Plaintiff Amour seemed to have about the different personalities and personal relationships in the warehouse.

61.   Sullivan offered Amour the position of Hard Lines Manager.

62.   Amour declined the Hard Lines Manager position.

63.   Section 11.2 of the Employee Agreement lists certain actions which are cause for termination, including:

> Falsification of Company records and/or time card including omitting facts or willfully giving wrong or misleading information. This includes, but is not limited to, the employment application, internal investigations, benefit enrollment forms, inventory, vault or sales audit forms, signing someone else's time card or swiping someone else's name badge, [or] having your time card signed or your name badge swiped by someone else.

64.   Each warehouse has a Payroll Department, which Costco audits approximately every six months to ensure that the warehouse is adhering to Costco's payroll policies and procedures.

65.   During the relevant time, Warehouse 390's Payroll Department consisted of a Payroll Administrator (Plaintiff Amour) and a Back-up Payroll Administrator (Dawn Maas).

66.   Warehouse 390's Administrative Manager, Terri McDaniel, oversaw the Payroll Department.

67.   Hourly employees record their hours worked by swiping their Costco-issued name badges through a card reading device when they arrive at work, each time they leave for and return from lunch/dinner, and when they leave work for the day.

68.   From these "swipes," the Payroll Department generates computerized data which, in turn, generates employee paychecks.

69.   Occasionally, employees forget or are unable to swipe in at the beginning of the

day, or when they leave for a meal break, or when they leave for the day.

70. If not corrected, these swipe errors would result in employees receiving paychecks in the wrong amounts.

71. To avoid this, Costco has a daily "Exception Log" for tracking errors or other extenuating circumstances regarding the recording of time.

72. The Payroll Department then uses the Exception Log to correct employees' computerized time records.

73. This process of correcting the computerized data is called "balancing the payroll" in Costco parlance.

74. On January 28, 2002, Plaintiff Amour was interviewed by Brooks and Sullivan regarding payroll documents.

75. On January 28, 2002, Plaintiff Amour was suspended pending further investigation.

76. Sullivan then presented the information about Amour he had obtained to Richard Webb, Regional Vice President, Midwest Operations (Webb was Sullivan's supervisor).

77. Plaintiff Amour was terminated on February 1, 2002.

### G.    *Facts Regarding Plaintiff Erica Betts.*

78. Costco hired Plaintiff Erica Betts as a part-time front end assistant in April 1998.

79. Shortly thereafter, Plaintiff Betts transferred to a part-time front end cashier position.

80. From July 16, 2001 through February 2002, Plaintiff Betts was a full-time cashier.

81. On February 1, 2002, Plaintiff Betts was terminated.

### H.    *Other Facts.*

82. Sullivan admits telling Plaintiff Amour that Warehouse 390 "looked like a plantation."